WATERMAN, Justice.
In this appeal, we must decide whether the district court correctly denied an employer’s motion for new. trial following a $1.4 million jury verdict for the plaintiff on claims under the Iowa Civil Rights Act (ICRA) for employment discrimination *562 based on sexual harassment by a direct supervisor and coemployees. The employer argues the district court erred by submitting a direct negligence claim instead of vicarious liability for supervisor harassment and misinstructed the jury on the elements of proof, the causation standard for retaliation, the definition of adverse employment action, and constructive discharge. The employer also argues a new trial is required for attorney misconduct, errors in allowing expert testimony on legal standards, and excessive damages, which included $1 million for future emotional distress. Finally, the employer argues the district court erred by awarding excessive attorney fees of $846,364, the full amount claimed.
For the reasons explained below, we hold that workers may bring a direct-liability negligence claim under the ICRA against- the employer for supervisor harassment, but the plaintiff must prove the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action to end it. We conclude that prejudicial errors in four jury instructions require a new trial. We find no abuse of discretion in the admission of the expert testimony. We need not decide the remaining issues raised in the appeal.
I. Background Facts and Proceedings.
The jury could find the following facts based on the record developed at trial. Homeland Energy Solutions, LLC (HES) operated an ethanol plant with forty-five employees in Lawler, Iowa.' On February 16, 2009, HES hired Tina Haskenhoff as a lab manager at the plant. That day, she was provided with a copy of the HES employee handbook, which included its policy on sexual harassment. The policy stat: ed sexual harassment was prohibited and provided that “[a]n employee who believes he or she has been subject to harassment prohibited by this policy should report the incident immediately to their supervisor or a member of the Management Team.” The policy stated any complaint of sexual harassment would be investigated and any employee may bring a complaint “without fear of reprisal.”
Haskenhoff was repeatedly harassed by her immediate supervisor, Kevin Howes, HES’s operations manager. Howes repeatedly made inappropriate comments in Haskenhoffs presence. For example, Howes talked about Haskenhoffs breasts on at least three occasions, referring to them as “them puppies” or “the twins.” Howes discussed Haskenhoffs body and attire with other employees and speculated out loud about what it would be like to have sex with her. He insinuated to other male employees that they could get Tina into bed. He commented on the attractiveness or unattractiveness of female job applicants and employees. He spoke at work about strippers. On multiple occasions, he used objects or engaged in body motions in front of Haskenhoff to simulate sexual behavior.
Haskenhoffs coemployees also engaged in inappropriate conduct in her presence. One displayed a screen saver on his computer of two young girls touching tongues. Another photographed Haskenhoffs cleavage at a company outing and showed that photo to others. Haskenhoff received an unwanted pornographic video from yet another employee. The atmosphere Hasken-hoff experienced at the HES plant was unseemly and unprofessional.
In November 2010, Haskenhoff told Howes she needed to leave work early for a mammogram. She remembered Howes responding, “[Wjell, you know, if you sat out in the parking lot you could probably make some money.” She interpreted this *563 to mean, “[I]f I sat in my car and put a sign up guys would pay to grope me.” Howes’s recollection differed; he recalled he told Haskenhoff she “could go around the corner and use the copying machine and save herself some money.” He stated that he meant Haskenhoff could “[u]se the copying machine, make a photocopy [of her breast] versus going to the doctor.” Howes acknowledged that his comment was inappropriate. Haskenhoff reported the incident to the plant manager, Chad Kuhlers. Kuhlers forwarded Haskenhoffs report to the head of human resources, Sarah Frein. The next day, Howes came to Haskenhoffs office and spoke with her. He apologized for his comment and expressed concern that Kuhlers wanted him fired because of it. Haskenhoff said Howes made her feel “very intimidated.” Shortly after her interaction with Howes, Walter Wendland, the chief executive officer (CEO) of HES, asked Haskenhoff to come to his office. She recalled at this meeting,
[Wendland] said—he was kind of, like, well, what’s going on here, and he said you know Chad [Kuhlers] really wants me to fire Kevin over this, and I said I never asked Chad to fire him. And then Walt went on to say, well, come [on]. I thought we were like a family. You don’t want to do this to your family.
On December 7, Frein called Haskenhoff into her office to discuss her complaint. Jeff Grober, the chief financial officer (CFO), was also present in Frein’s office. At that meeting, Frein’s notes indicate that she had planned “further discussion” about the complaint, but Haskenhoff stated she did not want the investigation to go further because she did not want Howes to be fired. Haskenhoff later testified about that meeting:
Q. And what happened in that meeting? A. They asked me about it. She said that Chad had notified her of something Kevin had said to me that I reported as making me uncomfortable, and I said he did. And I think I broke down at that point, and I said I don’t want him to get fired over this, you know. I said to her I’m sure now that he knows, now that it has been pointed out to him, surely he will stop. Anybody would stop.
Q. Is that what you believed would happen? A. Yes.
Q. Did you tell ’em you wanted it dropped? A. I said if it were going to come to the point of Kevin getting fired, I didn’t want to go—I didn’t want to officially go further at all because I did not want him fired over that.
Q. Did you want them to do something about it? A. Yes.
At Haskenhoffs request, Frein took no further disciplinary action against Howes at that time.
Wendland later removed Kuhlers as plant manager and promoted Howes to that position. For the next nine months, Haskenhoff made no complaints to management about Howes. Her performance review in January 2011 noted that she met or exceeded requirements in all areas. However, the review also noted that Hask-enhoff had areas to work on and referenced an email dispute in which Hasken-hoff had become argumentative with a subordinate over lab procedures. In May, she began seeking a position at John Deere.
On August 8, Haskenhoff walked by Howes’s office and overheard him talking on his cell phone. Haskenhoff recently had told Howes she intended to marry her long-time boyfriend. Haskenhoff overheard Howes say, ‘Yep, she’s getting married. And for a good reason (pause) for money.” This comment upset Haskenhoff. She walked into the control room and told another employee, “Okay. Kevin is a [f&#%!@”g] asshole. I am leaving. I will *564 be back tomorrow.” Haskenhoff left work at 11:15 that morning.
Haskenhoff sent an email to Howes expressing her disgust at his comment. Howes replied that he had not meant to offend her and asked her to meet the next day in his office to discuss the issue. Later that night, Howes sent an email to the CEO; Wendland; the CFO, then David Finke; and the commodities manager, Steve Wubbena. In the email, Howes said he wanted to discipline Haskenhoff for calling him expletives in front of subordinate employees,, for leaving the lab a mess, and for leaving work without permission for the day. He pointed out Hask-enhoff had been the only lab person scheduled, lab samples had not been completed, they were in the middle of a lab trial, and she “blew off” a conference , call by leaving. Howes also expressed frustration at Hask-enhoffs attitude, her frequent smoke breaks, and her failure to arrange, coverage for her shifts on her days off. Finke responded, “We claim that she does a lot of things poorly, do we have any of this documented and on file?”
The next day, Haskenhoff met with Howes and Wubbena in Howes’s office. They discussed the conduct from the day before, and Howes apologized. Howes also used the term “insubordination” to refer to Haskenhoffs reaction to his comment. Haskenhoff replied using terms such as “sexual harassment” and “hostile work environment” to refer to Howes’s conduct. She then told Howes about other conduct in the office, including about a coemployee having an inappropriate screen saver and inappropriate nicknames being used in the office. Howes responded after their meeting by directing the employees, to cease using the nicknames and to remove the screen saver.
The following week, Frein emailed Haskenhoff asking for “facts, examples, and concerns [of inappropriate conduct] in writing, so we can get them addressed appropriately.” Haskenhoff responded by email to Frein the same day, listing multiple incidents of inappropriate conduct and stating the list was long “but not all encompassing.” Haskenhoff said the only reason she brought the issues up was that Howes had threatened to write her up for insubordination. Frein immediately forwarded this email to Finke, who responded, “I don’t think we can discount anything that is mentioned below. Some of it may be embellished a bit, but we still cannot just take it with a grain of salt.” Finke stated that the first step was to look at the employee handbook, the second step was a plant-wide training for sexual harassment, and the third step was devising a plan to address the issue with Howes..
- The next day, Howes prepared a written warning for Haskenhoffs conduct leaving work early. He also provided Frein with a statement of what occurred during the August 9 meeting. Wubbena forwarded a statement to Frein as well. A day later, Finke emailed Frein recounting that he told Howes he needed to be “OVERLY” professional in “ALL” of his work-related endeavors moving forward. Finke’s email also told Frein, “In the meantime, I want you to be thinking about forming a game plan for investigation [of] Tina’s claims.” Frein enlisted the help of outside counsel, James Gilliam, that day. Frein asked Gilliam questions about HES’s next steps, including whether Haskenhoff, could be disciplined for leaving work early without permission and for “plotting” against Howes.
HES investigated Haskenhoffs complaint by interviewing employees, including Haskenhoff and Howes. During Hasken-hoffs interview on August 23, Wendland and Frein were present and reviewed Haskenhoffs list of incidents. As to several *565 incidents, Wendland commented to Hask-enhoff that the conduct did not violate the company’s policy and crossed them off the list in her presence. ■
While the investigation was ongoing, Howes began drafting staff-counseling forms, or write-ups, for what he perceived as Haskenhoffs insubordination leaving the plant early on August 8. Howes indicated he wanted to terminate Haskenhoff and contacted other employees to gather more evidence of her insubordination. Howes also repeatedly reminded other employees to keep work professional and informed them of ■ upcoming mandatory harassment training., Gilliam and Frein recommended that Haskenhoff not be disciplined for her conduct because “the timing was inappropriate.” Finke told Howes by email that he did not feel comfortable terminating Haskenhoff, stating,
I honestly feel that Walt and I are getting to the bottom of a very serious situation and that we are doing it in the proper manner. For me, the end goal is to make an informed proper conclusion per Homeland’s policies and under the guidance of qualified legal counsel.
Nevertheless, Howes drafted two final staff-counseling forms regarding Hasken-hoff, one entitled “#3” and the other “#4.” He emailed these forms to Wendland and Finke. Form #3 discussed the investigation and listed 'the “numerous harassment/inappropriate behavior claims” as one of the reasons for disciplining Hasken-hoff. Form #4 did not mention the investigation and focused on Haskenhoffs conduct on August 8 leaving work without permission. Howes said he liked #4 because “it does not come across as being retaliatory in nature.” Both forms recommended giving Haskenhoff a written warning and ninety-day performance improvement plan.
On August 29, Wendland and Finke presented Howes with a written staff-counseling form, which determined that Howes had “made unprofessional and unacceptable comments in the'workplace.” It stated that HES expected Howes’s conduct to improve and that if it did not, he would be subject to disciplinary action, including possible discharge. Two days later, Wend-land and Finke met with Haskenhoff to discuss the results of the investigation. They assured her that she would not be retaliated against and directed her to report any perceived retaliation to Finke or Wendland. Then, while Wendland and Finke were still present, Howes entered the room and presented Haskenhoff with a draft performance improvement plan addressing her conduct on August 8. Hasken-hoff disagreed with many allegations in the plan. The men assured her the plan would be redrafted to reflect her concerns. The next day, Haskenhoff reported to HES for work. At around 11 a.m., she entered Finke’s office and resigned, calling the previous day’s events “bullshit.”[1] Six weeks later, Haskenhoff began working at John Deere.
Haskenhoff filed an administrative complaint with the IGRA eight months later. After receiving an administrative release, Haskenhoff filed a civil action in Chickasaw County District Court, alleging sexual harassment and retaliation under the ICRA. The jury trial commenced on October 1, 2014, and spanned three weeks.
. HES filed multiple motions in limine, several of which were granted by the district court. An order in limine prohibited Haskenhoffs counsel from making any ref *566 erence to “rape,” “sexual assault,” or similarly inflammatory terms and expressly prohibited making any analogy between rape and the harassment complaint. Despite that ruling, Haskenhoffs counsel, during her examination of HES’s CEO at the jury trial, asked this question:
Q. I mean, don’t you think it would be analogous, for instance, if someone had accused someone of rape and then the person they accused of rape was able to walk in and say that’s defamation for saying I’m a rapist?
MR. VISSER: Objection; this is argument, it’s improper, and violates the terms of pretrial orders.
THE COURT: Sustained as to argumentative.
Another order in limine forbade Hasken-hoffs counsel from offering testimony about Howes’s character or referring to him as “juvenile, immature, chauvinistic, vindictive, holding a grudge, or capable of retaliation,” as such evidence was not probative of truthfulness. Counsel for Hasken-hoff nevertheless asked the following questions in front of the jury:
Q. [To Matthew Dutka, employee of HES] And based on knowing and observing [Howes], is he the kind of person that would be likely to use people to get what he wants?
[[Image here]]
Q. [To Wade Heideman, employee of HES] Based on your observations about Kevin, would he be the kind of guy who would hold a grudge?
[[Image here]]
Q. [To Sherri Hansen, employee of HES] From your time working with Mr. Howes, do you think he would have done everything in his power to get rid of Tina?
Counsel for HES objected over 574 times during the trial, according to Haskenhoff. The court sustained 353 defense objections, or sixty-one percent. By contrast, counsel for Haskenhoff objected fifty-nine times, thirty of which were sustained (fifty-one percent).
The district court denied HES’s motion in limine to exclude the testimony of expert witness Dr, Louise Fitzgerald, professor emeritus of the University of Illinois at Urbana-Champaign, who taught Psychology and Gender and Women’s Studies. HES argued her testimony included inadmissible legal conclusions. Dr. Fitzgerald testified over defense objections about the standard of care in the human resources field for policies and procedures regarding sexual harassment and HES’s alleged failure to meet that standard. She also testified about victims’ typical reactions to sexual harassment and stated Haskenhoff displayed those reactions. HES argues the jury instructions were shaped to reflect Dr. Fitzgerald’s testimony. At the close of evidence, the parties made a record on jury instructions.
A. Direct Negligence Versus Vicarious Liability for Supervisor Harassment. HES requested an instruction on sexual harassment that applied different standards of liability depending on the harasser’s position within the company. For harassment by a coworker, HES’s proposed instruction stated it would be liable if it “knew or' should have known of the abusive or hostile conduct and failed to take prompt and corrective action to end the harassment.” If the harasser was a supervisor, HES’s proposed instruction did not require the plaintiff to prove HES knew or should have known of the harassment, but allowed HES to prove, as an affirmative defense, that it “exercised reasonable care to prevent and correct promptly any sexually harassing behavior” and that Haskenhoff “unreasonably failed to take advantage of any preventative or *567 corrective opportunities provided by Homeland Energy Solutions or to avoid harm otherwise.” This is commonly known as the Faragher-Ellerth defense to employer liability. See Faragher v. City of Boca Raton, 524 U.S. 775, 807, 118 S.Ct. 2275, 2293, 141 L.Ed.2d 662 (1998); Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 765, 118 S.Ct. 2257, 2270, 141 L.Ed.2d 633 (1998).
Haskenhoff argued for a single marshaling instruction on a direct negligence theory that encompassed harassment by a supervisor or coworker. The district court agreed and gave an instruction nearly identical to Haskenhoffs proposed instruction. The court’s marshaling instruction stated,
INSTRUCTION NO. 14
COUNT I-SEXUAL HARASSMENT CLAIM
In order to recover damages on her claim of sexual harassment, the plaintiff, Tina Haskenhoff, must prove all of the following elements of her claim:
1. The plaintiff, Tina Haskenhoff, was subjected to offensive conduct by employees, agents, or officers of Homeland Energy Solutions, L.L.C. while employed at its ethanol plant.
2. Such conduct was unwelcome.
3. Tina Haskenhoffs sex played a part in such conduct.
4. This conduct was sufficiently severe or pervasive that a reasonable person in Tina Haskenhoffs position would find her work environment was hostile or offensive.
5. At the time this conduct occurred and as a result of this conduct, Tina Haskenhoff believed that the work environment was hostile or abusive.
6. Homeland Energy Solutions, L.L.C., knew or should have known of the occurrence of one or more sexually harassing incidents.
7.Homeland Energy Solutions, L.L.C. acted negligently in creating or continuing a hostile work environment.
If you find that the plaintiff, Tina Haskenhoff, has failed to prove any of these propositions, the plaintiff is not entitled to damages on her claim of sexual harassment. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount.
HES objected to this marshaling instruction, citing Farmland Foods, Inc. v. Dubuque Human Rights Commission, on liability for sexual harassment and the applicability of the Faragher-Ellerth defense. 672 N.W.2d 733, 744 (Iowa 2003). HES also objected that the negligence standard had been incorrectly defined, stating, “Again, to the extent that there is co-worker harassment, the standard—the element is knew or should have known and failed to take appropriate and prompt remedial action”—an element of proof was missing from the court’s instruction.
B. Retaliation Instruction—Causation. HES objected to the court’s marshaling instruction on Count II, retaliation. HES requested an instruction that required Haskenhoff to prove the protected activity was a “significant factor” motivating the adverse employment action. In contrast, Haskenhoffs proposed instruction, which the district court in large part adopted, provided that the protected activity need only have “played a part” in defendant’s decision to take the adverse action. The court’s marshaling instruction stated,
INSTRUCTION NO. 26
COUNT II-RETALIATION CLAIM
In order to recover damages on her claim of retaliation, the plaintiff, Tina *568 Haskenhoff, must prove all of the following elements of her claim:
1. The plaintiff, Tina Haskenhoff, engaged in protected activity by complaining about sexual harassment.
2. The defendant, Homeland Energy Solutions, L.L.C., took adverse action against Tina Haskenhoff.
3. The protected activity played a part in Homeland Energy Solutions, L.L.C.’s decision to take the adverse action.
Instruction No. 28 elaborated,
INSTRUCTION NO. 28 FACTOR-DEFINED
The plaintiff’s harassment complaints played a part in her treatment if those complaints were a factor in the defendant’s employment actions toward her. However, her harassment complaints need not have been the only reason for the defendant’s actions.
HES objected to these instructions, stating that the elements of a retaliation claim, as set forth in our decisions, “all provide that ... causal connection is satisfied by a showing that the protected activity was a significant factor motivating the adverse employment action.” HES cited City of Hampton v. Iowa Civil Rights Commission, 554 N.W.2d 532, 535 (Iowa 1996), and Hulme v. Barrett, 480 N.W.2d 40, 42 (Iowa 1992).
C. Adverse Action. HES also objected to the court’s instruction defining “adverse employment action.” HES requested an instruction that defined an adverse employment action as
an action that detrimentally affects the terms, conditions, or privileges of employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employee are not adverse employment actions. It includes, but is not limited to, employment actions such as termination of an employee, failure to promote, or any action that would discourage a reasonable employee from making a complaint of harassment. Giving an employee a performance improvement plan or negative employment review is not “adverse employment action” unless they are later used as a basis to alter the employee’s terms or conditions of employment in a detrimental way. Both the action and its context must be examined.
The district court declined to give HES’s proposed instruction and instead gave Haskenhoffs instruction, which listed more activities as examples of adverse action:
INSTRUCTION NO. 30
ADVERSE ACTION-DEFINED
“Adverse action” means any action which has material consequences to an employee. It is anything that might dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.
It includes but is not limited to, such employment actions as constructive discharge, reprimands or threats of reprimands, a change in opportunities, false accusations or complaints, being investigated, being placed on a performance improvement plan, being placed on probation, or other actions which adversely affect or undermine the position of the employee. It also includes an employer seeking out negative feedback on an employee, or condoning or encouraging other employees to complain about her. You should judge whether an action is sufficiently adverse from the point of view of a reasonable person in the plaintiffs position.
HES objected, stating the second paragraph was “misleading and an incomplete statement of the law” because it included reprimands and other matters never found *569 to constitute adverse action. The court overruled the objection.
D. Constructive Discharge. HES objected to the court’s instruction on constructive discharge, which was adopted verbatim from Haskenhoffs proposed instruction and stated,
INSTRUCTION NO. 33
CONSTRUCTIVE DISCHARGE-EXPLAINED
An employee is constructively discharged if the employer deliberately makes her working conditions intolerable so that the employee reasonably feels forced to quit. The work environment need not literally be unbearable to be intolerable under the law. The employer need not really want the employee to quit. It is sufficient that the employee’s resignation was a- reasonably foreseeable consequence of the working conditions created or permitted by the employer.
, The employee must show that she was subjected to sexual harassment or retaliation [that] made her believe there was no chance for fair treatment at Homeland.
An employee does not need to stay as an employee if she reasonably believes there is no possibility the employer will treat her fairly. It is enough if the employee has no recourse within the employer’s organization or reasonably believes there is no chance for fair treatment. The intolerable working conditions may be created by either the action or inaction of the employer.
HES objected that the instruction was an “incomplete and misleading statement of the law” because it injected a subjective standard. HES also specifically objected to
the court’s failure to include language as suggested by the defendant in its constructive discharge claim, including but not limited to a statement that “the employee has an obligation to be reasonable, not assume the worst and not jump to conclusions; conditions will not be considered intolerable unless the employer has been given reasonable chance to resolve the problem.” ,
E. The Court’s Ruling. Following argument on each of the jury instructions, the court provided, “Court will overrule all of the objections and exceptions to' the instructions. Court believes they’re appropriate based on the factual record and the law as the court views it.” The case proceeded to verdict.
On October 23, the jury returned a verdict for Haskenhoff on both-counts and awarded damages in the amount of $1,400,-000—4100,000 in backpay, $300,000 in past emotional distress, and'$1,000,000 in future emotional distress. ■' ''
HES moved for a new trial on grounds of. (1) the instructional errors set forth above, (2) erroneous evidentiary rulings allowing Dr. Fitzgerald to testify as to legal conclusions, (3) misconduct by Hask-enhoffs counsel, and (4) excessive damages. Haskenhoff filed a motion requesting attorney fees and expenses of $846,364 and equitable relief of, frontpay of $240,000.
The district court denied HES’s motion for new trial. Specifically, the court found, “Jury instructions were thoroughly briefed by counsel and discussed at length with the court both on and off the record.” The court also noted that nearly all of HES’s asserted evidentiary errors were based on issues already ruled upon by the court during HES’s motion for summary judgment and motions in limine. The court found the attorneys’ conduct to be merely a product of zealous representation and damages were not excessive. The court awarded frontpay and attorney fees in the full amount requested and entered judg *570 ment for Haskenhoff for a total of $2,486,364.
HES filed a timely notice of appeal based on the issues raised in its motion for new trial and excessive attorney fees. We retained the appeal.
II. Standard of Review.
“We review alleged errors in jury instructions for correction of errors at law.” DeBoom v. Raining Rose, Inc., 772, N.W.2d 1, 5 (Iowa 2009) (quoting Boyle v. Alum-Line, Inc., 710 N.W.2d 741, 748 (Iowa 2006)). Similarly, we review the district court’s refusal to give a requested jury instruction for correction of errors at law. Alcala v. Marriott Int’l, Inc., 880 N.W.2d 699, 701 (Iowa 2016). “It is error for a court to refuse to give a requested instruction where it ‘correctly states the law, has application to the case, and is not stated elsewhere in the instructions.’ ” DeBoom, 772 N.W.2d at 5 (quoting Vaughan v. Must, Inc., 542 N.W.2d 533, 539 (Iowa 1996)). Instructional error “does not merit reversal unless it results in prejudice.” Id. (quoting Wells v. Enter. Rent-A-Car Midwest, 690 N.W.2d 33, 36 (Iowa 2004)). Prejudicial error results when instructions materially misstate the law or have misled the jury. Id. Jury instructions must be considered “in their entirety” when assessing prejudice. Id. (quoting Anderson v. Webster City Cmty. Sch. Dist., 620 N.W.2d 263, 265 (Iowa 2000)). “We assume prejudice unless the record affirmatively establishes that there was no prejudice.” Rivera v. Woodward Res. Ctr., 865 N.W.2d 887, 903 (Iowa 2015).
“We review a trial court’s decision to admit or exclude expert testimony for an abuse of discretion.” Ranes v. Adams Labs., Inc., 118 N.W.2d 677, 685 (Iowa 2010). We reverse district court rulings on the admissibility of expert opinion testimony “only when the record shows ‘the court exercised [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.’ ” Id. (alteration in original) (quoting State v. Maghee, 573 N.W.2d 1, 5 (Iowa 1997)). Grounds are untenable when they are unsupported by substantial evidence or based on an erroneous application of the law. Id.
III. Analysis.
The first question we must decide is whether Haskenhoff could recover from HES on a direct negligence theory for harassment by her supervisor, Howes. HES contends a supervisor-harassment action requires a vicarious liability theory and an affirmative-defense instruction, while only a coworker-harassment action can be brought under a direct-liability negligence (direct negligence) theory. Hasken-hoff contends a plaintiff may sue the employer under a direct negligence theory for both supervisor and coworker harassment. We hold employers can be held liable for supervisor harassment under the ICRA on a direct negligence theory. However, the plaintiff must prove the employer failed to take prompt and appropriate remedial action to end the harassment, a fighting factual issue at trial. Because the district court’s marshaling instruction omitted that element, a new trial is required.
We next address the three remaining instructional errors in turn. We conclude the jury was misinstructed on the causation element for retaliation, on the definition of adverse employment action, and on constructive discharge. These prejudicial instructional errors also require a new trial. Finally, because the issue is likely to recur on remand, we address the admissibility of Dr. Fitzgerald’s testimony and conclude the district court did not abuse its discretion by allowing her testimony.
*571 A. Does the ICRA Allow a Plaintiff to Bring a Direct Negligence Claim Against the Employer for Supervisor Harassment? The parties agree that a plaintiff may sue an employer under a vicarious liability theory for supervisor harassment and may bring a direct negligence claim against the employer for coworker harassment. The fighting issue is whether the direct negligence theory also may be used for supervisor harassment. Because supervisors are employees and the caselaw has not limited recovery to vicarious liability, we conclude a plaintiff can elect to sue an employer for supervisor harassment under either theory.
We begin with the text of the statute. Iowa Code section 216.6(1) (2011) forbids the creation of a hostile working environment, stating,
It shall be an unfair or discriminatory practice for any:
a. Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the ... sex ... of such applicant or employee, unless based upon the nature of the occupation.
To establish a hostile-work-environment claim under the ICRA,
the plaintiff must show: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment.
Boyle, 710 N.W.2d at 746 (quoting Farmland Foods, 672 N.W.2d at 744). Harassment affects a term, condition, or privilege of employment “[w]hen the workplace is permeated with ‘discriminatory intimidation, ridicule, and insult’ ... ‘sufficiently severe or pervasive to alter the conditions of the victim’s employment and create an abusive working environment.’ ” Farmland Foods, 672 N.W.2d at 743 (alterations in original) (quoting Harris v. Forklift Sys., Inc., 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993)). When harassment is perpetrated by a nonsupervisory employee, an employer will be liable if the plaintiff proves the employer “knew or should have known of the harassment and failed to take proper remedial action.” Id. at 744 (quoting Stuart v. Gen. Motors Corp., 217 F.3d 621, 631 (8th Cir. 2000)). However, when harassment is perpetrated by a supervisory employee, an employer may be subject to vicarious liability. Id. The employer defending a vicarious liability claim may assert the Faragher-Ellerth affirmative defense
by showing it: (1) “exercised reasonable care to prevent and correct promptly any ... harassing behavior,” and (2) “that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise.”
Id. at 744 n.2 (quoting Faragher, 524 U.S. at 807, 118 S.Ct. at 2293).
HES argues the jury should have been instructed on vicarious liability, including the Faragher-Ellerth defense, because vicarious liability replaced the negligence standard for supervisor harassment. Haskenhoff argues the vicarious liability standard did not replace, but rather supplemented, the direct negligence standard. Because the ICRA hostile-work-environment, claim is modeled after its Title VII counterpart, we consider federal law instructive.[2] Boyle, 710 N.W.2d at 749-50 *572 (recognizing that Title VII hostile-work-environment claim has the same elements as ICRA claim); see also DeBoom, 772 N.W.2d at 7 (“When interpreting discrimination claims under Iowa Code chapter 216, we turn to federal law, including Title VII of the United States Civil Rights Act... .”)• Accordingly, we will review the development of these liability theories under federal caselaw and the interplay of those decisions with our court’s precedents.
The United States Supreme Court first recognized hostile-work-environment sexual harassment as actionable discrimination in Meritor Savings Bank, FSB v. Vinson, 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), notably a supervisor-harassment case. Although the Court declined to adopt a definitive rule for sexual-harassment liability, it expressly rejected the notion that “employers are always automatically liable for sexual harassment by their supervisors.” Id. at 72, 106 S.Ct. at 2408. Instead, the Court looked to “agency principles for guidance” in setting liability standards. Id. A four-justice concurrence noted the predominant standard at the time for coworker-harassment liability: that an employer will be liable when it “knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.” Id. at 74, 106 S.Ct. at 2409 (Marshall, J., concurring) (quoting 29 C.F.R. § 1604.11(c), (d) (1985)).
Four years later, in Lynch v. City of Des Moines, we held that “maintenance of a sexually hostile work environment through sexual harassment is a form of illegal sex discrimination under [the ICRA].” 454 N.W.2d 827, 833 (Iowa 1990). We determined the plaintiff was required to prove “the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action.” Id. Although Lynch was a coworker-harassment case, subsequent decisions recognized this standard applied to both supervisor and coworker harassment under the ICRA. See Greenland v. Fairtron Corp., 500 N.W.2d 36, 38 (Iowa 1993) (citing same standard for supervisor harassment); Vaughn v. Ag Processing, Inc., 459 N.W.2d 627, 634 (Iowa 1990) (en banc) (applying same standard to supervisor harassment); Edmunds v. Mercy Hosp., 503 N.W.2d 877, 879 (Iowa Ct. App. 1993) (noting same standard for supervisor harassment).
In 1998, the United States Supreme Court recognized employer vicarious liability for supervisor harassment. Ellerth, 524 U.S. at 759, 118 S.Ct. at 2267. The Court *573 relied on the Restatement (Second) of Agency, which states,
(2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
[[Image here]]
(b) the master was negligent or reckless, or
[[Image here]]
(d) the servant purported to act or speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.
Id. at 758, 118 S. Ct. at 2267 (quoting Restatement (Second) of Agency § 219(2) (1957)). The Court reasoned harassment committed by a supervisor was “aided by the agency relation” within the scope of section (d) when a supervisor takes a tangible employment action against the employee because “the injury could not have been inflicted absent the agency relation. ... A tangible employment decision requires an official act of the enterprise, a company act.” Id. at 761-62, 763, 118 S.Ct. at 2269; see also Faragher, 524 U.S. at 802, 118 S.Ct. at 2290 (“[I]n implementing Title VII it makes sense to .hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an appropriate starting point for determining liability....”). In addition, even when no tangible employment action results, the Court observed that “a supervisor’s power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor is always aided by the agency relation.” Ellerth, 524 U.S. at 763, 118 S.Ct. at 2269. Thus, the Court held that the employer would be vicariously liable unless it could show
(a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.
Id. at 765, 118 S. Ct. at 2270. The Court echoed this vicarious liability standard for supervisor liability in Faragher, another supervisor-harassment case decided on the same day. 524 U.S. at 807, 118 S.Ct. at 2292-93.
Iowa adopted the vicarious liability standard of Ellerth and Faragher in Farmland Foods, a hostile-work-environment claim under the ICRA. 672 N.W.2d at 744. Since then, employees bringing harassment claims under the ICRA have used the vicarious liability standard to hold employers liable for supervisor harassment. See, e.g., Reed v. Cedar County, 474 F.Supp.2d 1045, 1061-62 (N.D. Iowa 2007); Krambeck v. Children & Families of Iowa, Inc., 451 F.Supp.2d 1037, 1041 (S.D. Iowa 2006); Lopez v. Aramark Unif. & Career Apparel, Inc., 426 F.Supp.2d 914, 949 (N.D. Iowa 2006); Fisher v. Elec. Data Sys., 278 F.Supp.2d 980, 986-87 (S.D. Iowa 2003).
Merely because vicarious liability is available in cases of supervisor harassment does not mean the negligence standard in place before Ellerth, Faragher, and Farmland Foods has been abrogated. To the contrary, Ellerth expressly states that the direct negligence standards set forth in subsection (b) of the Restatement-of Agency, remains an alternative ground for establishing employer liability for supervisor harassment:
Subsections (b) and (d) are possible grounds for imposing employer liability on account of a supervisor’s acts and must be considered. Under subsection *574 (b), an employer is liable when the tort is attributable to the employer’s own negligence. Thus, although a supervisor’s sexual harassment is outside the scope of employment because the conduct was for personal motives, an employer can be liable, nonetheless, where its own negligence is a cause of the harassment. An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII; but Ellerth seeks to invoke the more stringent standard of vicarious liability.
Ellerth, 524 U.S. at 758-59, 118 S.Ct. at 2267 (emphasis added) (citation omitted). We conclude the vicarious liability theory was intended to supplement, not replace, the direct negligence theory for supervisor harassment.
The Supreme Court’s decision in Vance v. Ball State University, 570 U.S. -, 133 S.Ct. 2434, 186 L.Ed.2d 565 (2013), is not to the contrary. At issue in Vance was whether a certain employee was merely a coworker, for which the employer could only be held liable under the negligence standard, or a supervisor, for which the employer could also face vicarious liability. See id. at -, 133 S.Ct. at 2443. The Court stated that “Ellerth and Faragher identified two situations in which the aided-in-the-accomplishment rule warrants employer liability even in the absence of negligence.” Id. at -, 133 S.Ct. at 2441 (emphasis added). That sentence simply confirms a nonnegligent employer can be vicariously liable for its supervisor’s harassment. See id. at -, 133 S.Ct. at 2439 (“[A]n employer’s liability for such harassment may depend on the status of the harasser.” (Emphasis added.)). We read nothing in Vance that precludes allowing a direct negligence theory. While Vance notes that “[i]n cases in which the harasser is a ‘supervisor’ ... different rules apply,” that simply reiterates that vicarious liability is imposed only for supervisor harassment, not for harassment by a nonsupervisory coemployee. Id. at -, 133 S.Ct. at 2439.
Several federal circuit courts of appeals after Ellerth and Faragher have held that suits for supervisor harassment can be brought under either vicarious liability or direct negligence theories. In Sharp v. City of Houston, the United States Court of Appeals for the Fifth Circuit recognized that a claim for supervisor harassment could proceed on a negligence “knew or should have known” theory because the negligence standard for supervisor harassment was “not disturbed by Faragher or [Ellerth].” 164 F.3d 923, 929 (5th Cir. 1999). The court noted that although the negligence standard was typically applied to coworker harassment, “[t]he concept of negligence thus imposes a ‘minimum standard’ for employer liability—direct liability—under title VII, a standard that is supplemented by the agency-based standards for vicarious liability as articulated in Faragher and [Ellerth].” Id. (citation omitted); see also Debord v. Mercy Health Sys. of Kan., Inc., 737 F.3d 642, 650-53 (10th Cir. 2013) (analyzing employer liability for supervisor harassment under both negligence and vicarious liability standards); Dees v. Johnson Controls World Servs., Inc., 168 F.3d 417, 421 (11th Cir. 1999) (“[A]n employer can be held directly liable for a supervisor’s harassment when the employer either intended, or negligently permitted, the tortious conduct to occur.”); Wilson v. Tulsa Junior Coll., 164 F.3d 534, 540 n.4 (10th Cir. 1998) (recognizing the “continuing validity of negligence as a separate basis for employer liability” in action in which employee alleged supervisor harassment). HES cites no decision that holds a plaintiff cannot *575 bring a direct negligence claim against an employer for supervisor harassment, and we have found none.
That employers are directly liable for their own negligence is not a new proposition. The Restatement (Second) of Employment Law, section 4.02, at 134 (2015), entitled “Employer’s Direct Liability to Employees for Its Own Conduct,” provides that “an employer is subject to liability in tort to an employee for harm caused in the course of employment by the tortious conduct of the employer or the controlling owner.” (Emphasis added.) Similarly, the Restatement (Third) of Agency, section 7.03, at 151 (2006), provides that a principal is liable for its own negligence in “selecting, supervising, or otherwise controlling the agent” in addition to any vicarious liability that may be imposed via the agent’s actions.
We hold that plaintiffs under the ICRA may proceed against the employer on either a direct negligence or vicarious liability theory for supervisor harassment in a hostile-work-environment case. The Faragher-Ellerth affirmative defense, with the burden of proof on the employer, applies only to claims of vicarious liability. Ellerth, 524 U.S. at 764, 118 S.Ct. at 2270 (adopting affirmative defense “in order to accommodate the agency principle of vicarious liability for harm caused by misuse of supervisory authority” (emphasis added)); accord Faragher, 524 U.S. at 807, 118 S.Ct. at 2292; see also Johnson v. Shinseki, 811 F.Supp.2d 336, 348 n.2 (D.D.C. 2011) (holding because the court applied the negligence standard, “the Far-agher defense is inapplicable”); Swinton v. Potomac Corp., 270 F.3d 794, 803 (9th Cir. 2001) (stating defense did not apply to negligence standard); Lintz v. Am. Gen. Fin., Inc., 50 F.Supp.2d 1074, 1081 (D. Kan. 1999) (rejecting Faragher-Ellerth defense in direct negligence action). By contrast, on a direct negligence claim, the plaintiff must prove “the employer ... failed to take prompt and appropriate remedial action.” Lynch, 454 N.W.2d at 833.
B. Whether the District Court Correctly Instructed the Jury on the Direct Negligence Theory. We next address whether the jury was correctly instructed on the direct negligence theory. The district court essentially adopted Hasken-hoffs proposed marshaling instruction, which omitted an element she was required to prove—that HES “failed to take prompt and appropriate remedial action.” Id. HES objected to the omission of that element, and we conclude the district court prejudicially erred by overruling the objection and giving Instruction No. 14 without that language. Whether HES in fact took “prompt and appropriate action” was a fighting issue at trial and a jury question. Haskenhoff did not establish as a matter of law that HES failed to take prompt and appropriate action.
The standard requiring a plaintiff to prove the employer’s failure to take prompt remedial action “places a reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it.” Vaughn, 459 N.W.2d at 634. Whether the employer met this duty is a question of fact and turns on “the gravity of the harm, the nature of the work environment, and the resources available to the employer.” Id.
The first time Haskenhoff complained to management about Howes’s harassment, senior management promptly met with her and Howes. Howes was verbally confronted in a manner that led him and others to believe he faced termination. Howes apologized to Haskenhoff, and Haskenhoff, believing the harassment issue was resolved, asked that no further action be taken at that time. See Nurse “BE" v. Columbia *576 Palms W. Hosp. Ltd. P’ship, 490 F.3d 1302, 1310 (11th Cir. 2007) (holding that if employee “did not want [the harassing behavior] reported or acted upon, then [the employer] would not have been placed on proper notice of the harassment” (alterations in original) (quoting Olson v. Lowe’s Home Ctrs., Inc., 130 Fed.Appx. 380, 391 n.21 (11th Cir. 2005))). Haskenhoff made no further complaints to management during the next nine months. HES management could reasonably assume its prior remedial efforts were adequate. See An v. Regents of Univ. of Cal., 94 Fed.Appx. 667, 676 (10th Cir. 2004) (determining employer not liable when initial complaint limited to one comment that made employee feel uncomfortable, then employee made no further complaint and assured management that things were “okay” until second complaint).
When Haskenhoff next complained of harassment in August of 2011, HES took immediate remedial action. A formal investigation was launched with outside counsel. Witnesses were interviewed. HES management admonished coemployees to conduct themselves professionally and take down the offensive screen saver. Sexual harassment training was scheduled. Howes was disciplined and apologized. See Wilson, 164 F.3d at 540 (jury may consider availability and effectiveness of employer’s complaint procedure). HES was entitled to have the jury decide whether Haskenhoff proved that it had failed to take prompt and appropriate action.
Haskenhoff argues Vance imposes liability when an employer is negligent in allowing harassment to occur, regardless of notice or subsequent corrective action. We disagree. Haskenhoff relies on this sentence in Vance: “As an initial matter, an employer will' always be liable when its negligence leads to the creation or continuation of a hostile work environment.” 570 U.S. at -, 133 S.Ct. at 2452.[3] How *577 ever, the Vance Court, two paragraphs later, reiterates the relevance of the employer’s remedial efforts under a negligence theory: “Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant.” Id. at -, 133 S.Ct. at 2453. Removing the requirement for the plaintiff to prove the employer neglected to take corrective action would impose strict or automatic liability on an employer whenever supervisor harassment occurred without a tangible adverse employment action, a position our court has never adopted and the Supreme Court has expressly declined to adopt. See Faragher, 524 U.S. at 804-05, 118 S.Ct. at 2291-92. Haskenhoff cites cases that she contends establish that an employer can be liable regardless of whether it took remedial action. Yet each of those decisions indicates the employer’s remedial action or lack thereof is relevant to whether it acted negligently.[4]
It has been suggested that the jury need not be instructed regarding the employer’s remedial efforts if management, negligently unaware of harassment, took no action. That is not this. case. Haskenhoff on two occasions complained to management about Howes’s harassment. On both occasions, management took action to stop the harassment. It was for the jury to determine, under proper instructions, whether *578 HES’s responses were adequate—that is, whether it “failed to take prompt and appropriate remedial action.” Lynch, 454 N.W.2d at 833.
We decline to interpret the ICRA to impose employer liability for supervisor harassment under a direct negligence theory despite the employer’s prompt and appropriate action to end the harassment. Notably, the Equal Employment Opportunity Commission (EEOC) in interpreting Title VII does not go so far. See 29 C.F.R. § 1604.11(d) (2016) (“[A]n employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action.” (Emphasis added.)). Indeed, most federal circuit model jury marshaling instructions for sexual harassment under Title VII require the plaintiff to prove the defendant failed to take prompt and appropriate remedial action.[5] None of the federal circuits hold an employer liable merely for “negligently creating or continuing a hostile work environment”—as the jury was instructed in this case. Rather, a party must not only show the employer knew of the harassment, but also that it unreasonably failed to take remedial action. See, e.g., Swinton, 270 F.3d at 803 (“[I]t was Swinton’s burden ... to prove that management knew or should have known of the harassment and ‘failed to take reasonably prompt, corrective action.’ ”). Under the instruction as given, the jury could have found HES liable even if the jury found the employer had in fact taken prompt and appropriate remedial action.
Employers would lose a key incentive to take corrective action if they were automatically hable for harassment whether or not they put a stop to it. As the Fifth Circuit observed, “Imposing vicarious liability on an employer for a supervisor’s ‘hostile environment’ actions despite its swift and appropriate remedial response to *579 the victim’s complaint would ... undermine not only Meritor but Title VII’s deterrent policy.” Indest v. Freeman Decorating, Inc., 164 F.3d 258, 266 (5th Cir. 1999). Employers are better deterred from allowing harassment to continue if their prompt corrective action will avoid liability. See Ellerth, 524 U.S. at 745, 118 S.Ct. at 2261 (“Limiting employer liability is also consistent with Title ATI’s purpose to the extent it would encourage the creation and use of antiharassment policies and grievance procedures.”).
Finally, allowing one marshaling instruction on direct negligence—requiring the plaintiff to prove the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action—for both coemployee and supervisor harassment avoids confusing jury instructions with differing standards. It also avoids issues over whether a particular employee is a supervisor. Mixing different authority levels of employees “presents no problem for the negligence standard.” Vance, 570 U.S. at -, 133 S.Ct. at 2452.
Haskenhoff is the master of her own pleadings. But by deciding to pursue a direct negligence theory for supervisor harassment, rather than vicarious liability, she assumed the burden of proving not only that HES knew or should have known of Howes’s harassment, but also that it failed to take prompt remedial action to stop it. Lynch, 454 N.W.2d at 833-34.
While the reasonableness of an employer’s response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the negligence standard, where she bears the burden of establishing her employer’s negligence, than under the vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiffs negligence.
Curry v. District of Columbia, 195 F.3d 654, 660 (D.C. Cir. 1999); see also Swinton, 270 F.3d at 804 (“It might reasonably be argued, in fact, that employers are ‘better off in the negligence context, where the plaintiff is required to prove both the employer’s knowledge of the harassment (or that it should have known) and that it failed to take reasonable corrective action.”). The district court erred by omitting that element of proof from Instruction No. 14. This error was not harmless.
Reversal is required when jury instructions contain a “material misstatement of the law” or are misleading or confusing. Rivera, 865 N.W.2d at 902. When an instruction fails to convey a central principle of liability, this warrants a new trial. See Benn v. Thomas, 512 N.W.2d 537, 539-40 (Iowa 1994) (remanding for new trial when jury instruction on proximate cause “failed to adequately convey the existing law”); Law v. Hemmingsen, 249 Iowa 820, 825-26, 89 N.W.2d 386, 390-91 (1958) (determining refusal to instruct on well-settled principle of negligence “at the very heart of the case” was error). The instruction omitted a central element of the plaintiffs claim—to show the failure of the employer to take prompt and appropriate remedial action. Omission of this element was a material misstatement of the law and entitles HES to a new trial. See State v. Pearson, 804 N.W.2d 260, 265 n.1 (Iowa 2011) (holding omission in the jury instruction of element of offense “requires a new trial”); Law, 249 Iowa at 825-26, 89 N.W.2d at 390-91 (reversing because it was error for court to refuse to instruct on combined negligence).
“We assume prejudice unless the record affirmatively establishes that there was no prejudice.” Rivera, 865 N.W.2d at 903. No prejudice results when *580 “one instruction arguably omits a legal requirement that is included in subsequent instructions on the ground that the instructions are to be read as a whole.” Id. “When, however, an inadequate instruction relating to the right of recovery goes to ‘the very heart of the case/ it is not rescued by abstract instructions elsewhere.” Id. (quoting Law, 249 Iowa at 825, 89 N.W.2d at 390). That is what we have here.
The district court gave a separate instruction, No. 24, on remedial action, which stated,
Once an employer knows or should have known of sexual harassment, it must take prompt remedial action reasonably calculated to end the conduct. The employer has the duty to take this remedial action even if an employee asks the employer not to do anything.
(Emphasis omitted.) This instruction was not cross-referenced in the marshaling instruction or any other instruction and does not cure the flaw in the marshaling instruction when the instructions are read as a whole. The jury was nowhere told Hask-enhoff had the burden to prove HES failed to take prompt and appropriate remedial action to end the harassment.[6]
Haskenhoff cites no case holding the fatal omission in the marshaling instruction could be cured by counsel during summation.[7] To the contrary, Haskenhoffs counsel took advantage of the flawed jury instruction in her closing argument. She did not say it was plaintiff’s burden to prove HES failed to take prompt remedial action, but instead argued
Number 24 talks about remedial action. Once an employer knows or should know about the sexual harassment, it must take prompt remedial action reasonably calculated to end the conduct. The employer has a duty to take this remedial action even if an employee asks the employer to do nothing.
*581 (Emphasis added.) This is not a case like State v. Thorndike in which counsel’s closing argument effectively cured the instructional error by conceding the improper instruction. did not apply under the evidence. 860 N.W.2d 316, 322-23 (Iowa 2015).
There was no instruction given by the court that allowed HES to argue plaintiff could not recover without proving it failed to take prompt remedial action. Closing arguments were lengthy, extending from the morning until 2:30 p.m. and encompassing 130.pages of the trial transcript. Closing arguments “generally carry less weight with a jury than do instructions from the court.” Boyde v. California, 494 U.S. 370, 384, 110 S.Ct. 1190, 1200, 108 L.Ed.2d 316 (1990). “The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter ... are viewed as definitive and binding statements of the law.” Id. (citation omitted).
We therefore determine HES is entitled to a new trial.[8] Rivera, 865 N.W.2d at 892 (“Prejudice occurs and reversal is required if jury instructions have misled the jury, or if the district court materially misstates the law.”).
C. Whether the District Court Erred in Instructing on a “Motivating Factor” Standard for Retaliatory Discharge. HES argues the district court erroneously adopted the lower “motivating factor” causation standard used in discriminatory discharge claims (Iowa Code section 216.6(l)(a)), rather than the higher “significant factor” causation standard used in retaliatory discharge claims (Iowa Code section 216.11(2)). Haskenhoff argues that (1) under DeBoom, 772 N.W.2d at 12-13, the correct causation standard for all ICRA claims is the motivating-factor test, and (2) unlike federal law, a lower causation standard for retaliation should be used because the ICRA is a unified statute and should be read broadly to effectuate its *582 broad remedial goals. See Iowa Code § 216.18(1). We note DeBoom was not a retaliation case and apply our retaliation decisions that require the higher causation standard. 772 N.W.2d at 13.
Our analysis begins with the text of the statute. The ICRA, Iowa Code section 216.11(2), makes it an unfair or discriminatory practice for
[a]ny person to ... retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.
In order to recover for retaliatory discharge, the plaintiff must prove
(1) he or she was engaged in statutorily protected activity, (2) the employer took adverse employment action against him or her, and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action taken.
Boyle, 710 N.W.2d at 750. The causation standard in retaliatory discharge cases has been characterized as “a high one.” City of Hampton, 554 N.W.2d at 535 (quoting Hulme, 480 N.W.2d at 42). The causal connection “must be a ‘significant factor’ motivating the adverse employment decision.” Id. (quoting Hulme, 480 N.W.2d at 42). A factor is significant if the reason “ ‘tips the scales decisively one way or the other,’ even if it is not the predominate reason behind the employer’s decision.” Teachout v. Forest City Cmty. Sch. Dist., 584 N.W.2d 296, 302 (Iowa 1998) (quoting Smith v. Smithway Motor Xpress, Inc., 464 N.W.2d 682, 686 (Iowa 1990)).
A separate provision, Iowa Code section 216.6(l)(a), forbids discriminatory discharge, i.e., discharge because of discrimination based on a protected characteristic. Retaliatory discharge is different; it prohibits discharge or discrimination based on the employee’s engaging in a protected activity. See id. § 216.11(2). Though the two concepts are related, they are not the same; one prohibits status-based discriminatory discharge, while the other prohibits discharge based on a protected activity in which an employee chooses to engage. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, 570 U.S. -, -, 133 S.Ct. 2517, 2532, 186 L.Ed.2d 503 (2013) (explaining the difference between status-based claims and retaliation claims). Under the discriminatory discharge statute, an employee must show discrimination based on a characteristic— not engaging in a protected activity—constituted a “motivating factor” in the adverse action of the employer. DeBoom, 772 N.W.2d at 12-13. Discrimination is a “motivating factor” in an adverse action if an employee’s status as a member of a protected class “played a part” in the employer’s decision. Id. at 12 (emphasis omitted). This is a lower causation standard than the significant-factor standard applied in retaliatory discharge cases under the ICRA and the common law.[9]
DeBoom clarified that the motivating-factor test applied to discriminatory discharge cases. See DeBoom, 772 N.W.2d at 13. But it did not alter—or even reference by name or Code section—retaliatory discharge claims. Id. Rather, in DeBoom, we were careful to note the difference between the discriminatory discharge causa *583 tion standard and the “higher” causation standard of claims such as tortious discharge. Id. We have frequently compared tortious discharge under common law and retaliatory discharge under the ICRA, as the two have traditionally possessed similar elements and causation standards. See Teachout, 584 N.W.2d at 301-02 (stating high causation standard for tortious discharge and comparing to Hulme, a retaliatory discharge case under the ICRA); see also Brown v. Farmland Foods, Inc., 178 F.Supp.2d 961, 979 (N.D. Iowa 2001) (“[T]he Iowa Supreme Court has consistently sought guidance in its common-law retaliatory discharge cases from its decisions involving claims of statutory retaliation, which further demonstrates that the Iowa Supreme Court would analyze these distinct causes of action in a similar manner.”); cf. Scott Rosenberg & Jeffrey Lipman, Developing a Consistent Standard for Evaluating a Retaliation Case Under Federal and State Civil Rights Statutes and State Common Law Claims: An Iowa Model for the Nation, 53 Drake L. Rev. 359, 414-15 (2005) (“The federal courts have used the same approach in defining actionable employment conduct in both statutory and common law cases.”). We noted in DeBoom that the lower motivating-factor standard did not apply to tor-tious discharge, nor was it intended to alter the higher significant-factor causation standard used in ICRA retaliatory discharge claims. 772 N.W.2d at 13.
Because Count II alleged retaliatory discharge under Iowa Code section 216.11 and not discriminatory discharge under section 216.6(l)(a), the jury should have been instructed on the correct causation standard—requiring Haskenhoff to prove her protected conduct was a significant factor. See, e.g., French v. Cummins Filtration, Inc., No. C11-3024-MWB, 2012 WL 3498566, at *3 (N.D. Iowa Aug. 15, 2012) (“[Under ICRA] [a]s to the causal connection element, the standard is high: ‘[T]he “causal connection” must be a “significant factor” motivating the adverse employment decision.’ ” (alteration in original) (quoting City of Hampton, 554 N.W.2d at 535)); Gilster v. Primebank, 884 F.Supp.2d 811, 831 n.4 (N.D. Iowa 2012) (analyzing both Title VII and ICRA together using determinative-factor approach), overruled on other grounds, 747 F.3d 1007 (8th Cir. 2014); Van Horn v. Best Buy Stores, L.P., 526 F.3d 1144, 1148 (8th Cir. 2008) (applying same higher causation to ICRA and federal claim).
Haskenhoff notes the ICRA discriminatory discharge and retaliatory discharge provisions use “similar” language. Compare Iowa Code § 216.6(l)(a) (stating it is a “discriminatory practice for any ... [p]erson to ... discharge any employee ... because of’ a protected characteristic (emphasis added)), with id. § 216.11 (stating it is a “discriminatory practice for ... [a]ny person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter” (emphasis added)).[10] But, as we *584 previously noted in Estate of Harris v. Papa John’s Pizza, the retaliation provision of the ICRA mirrors almost exactly the retaliation provision of Title VII, which states,
It shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this sub-chapter.
679 N.W.2d 673, 677 (Iowa 2004) (quoting 42 U.S.C.A § 2000e-3 (2004)). “Title VII was designed to ensure equal opportunity in employment for all, regardless of sex. The ICRA was modeled after Title VII, and therefore we have consistently employed federal analysis when interpreting the ICRA.” Id. at 677-78 (citation omitted). Finally, the ICRA’s elements for establishing a prima facie case of retaliation were derived “from federal decisions involving comparable provisions of Title VII of the Civil Rights Act of 1964.” Hulme, 480 N.W.2d at 42 (citing 42 U.S.C. §§ 2000e-2000e-3).
Title VII provides a higher causation standard for retaliation claims than discriminatory discharge actions. See Nassar, 570 U.S. at -, 133 S.Ct. at 2534. In Nassar, a retaliation case brought under Title VII, the Supreme Court explained that in codifying the 1991 Amendment to the Civil Rights Act, Congress did not intend to lower the causation standard for retaliatory discharge cases, although it unquestionably did so for discriminatory discharge. Id. at -, 133 S.Ct. at 2528-30. The Court reasoned that the two provisions used different language and were found in different sections of the Act and that Congress had inserted the amendment into only one part. Id. The Court also pointed out the increasing number of retaliation claims being filed. Id. at -, 133 S.Ct. at 2531. Lowering the causation standard, the Court explained, could increase the number of unfounded claims:
In addition lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employees], administrative agencies, and courts to combat workplace harassment. Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation .... Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage. It would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent. Yet there would be a significant risk of that consequence if respondent’s position were adopted here.
Id. at -, 133 S.Ct. at 2531-32 (citations omitted).
*585 Turning to the ICRA, the retaliatory discharge and discriminatory discharge provisions are codified at different sections of the Act, as they are in Title VII, which supports the same conclusion reached in Nassar that different causation standards apply. See id. at -, 133 S.Ct. at 2530-31. Compare Ioiwa Code § 216.6 (discriminatory discharge), with id. § 216.11 (retaliatory discharge). Moreover, as the Nassar Court concluded under Title VII, we have emphasized' that the ICRA’s retaliation protections cannot be so low as to “immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination.” City of Hampton, 554 N.W.2d at 535-36 (quoting Hulme, 480 N.W.2d at 43).
We reject Haskenhoffs contention that we are “blindly” following federal law. First, we are following our own precedent: our cases have made clear that the correct causation standard for a retaliatory discharge claim brought under section 216.11(2) of the ICRA is the significant-factor standard. See id. at 535; Hulme, 480 N.W.2d at 42. We are adhering to our consistent prior interpretations of the Act since 1992—interpretations that have not been disturbed by the legislature—and the doctrine of stare decisis. Ackelson v. Manley Toy Direct, L.L.C., 832 N.W.2d 678, 688 (Iowa 2013) (relying on stare decisis and legislative acquiescence to adhere to interpretation of the ICRA disallowing punitive damages); see also In re Estate of Vajgrt, 801 N.W.2d 570, 574 (Iowa 2011) (“The rule of stare decisis ⅛ especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature (quoting Iowa Dep’t of Transp. v. Soward, 650 N.W.2d 569, 574 (Iowa 2002)).
Predictability and stability are especially important in employment law. Employers must comply with both state and federal law. Human resources personnel and supervisors must apply myriad rules and regulations in complex situations. Employers and prospective employers should be able to rely on our precedents. We would generate significant uncertainty if we overrule our own long-standing precedent to diverge from settled federal interpretations. Uncertainty invites more litigation and increasing costs for all parties. An uncertain or costly litigation environment inhibits job creation.
The legislative history of the ICRA does not support the view that we should depart from our long-standing practice of looking to federal decisions to interpret the same or equivalent statutory language. While it is true some provisions of the ICRA predated Title VII,[11] the ICRA’s retaliation provision was enacted after Title VII and closely tracked the federal provision.[12] Ac *586 cordingly, we appropriately look to federal decisions for guidance. Moreover, other states follow the federal causation standard when interpreting their own state antiretaliation statutes.[13] Congruity between state and federal requirements makes it easier for employers and the bench and bar to apply and follow the law.
We conclude the district court’s instruction applying the motivating-factor causation standard was erroneous. In the marshaling instruction for Count II, retaliatory discharge, the district court should have instructed the jury that Haskenhoff must prove the protected activity was a significant factor motivating the adverse action, consistent with our precedent.
D. Whether the District Court’s Jury Instruction Improperly Defined “Adverse Employment Action.” Next, we address whether the court’s instruction defining an adverse employment action was erroneous. HES argues the instruction reflected an inaccurate statement of the law because it listed the following as examples of adverse action:
reprimands or threats of reprimands, ... false accusations or complaints, be *587 ing investigated, being placed on a performance improvement plan, being placed on probation, or other actions which adversely affect or undermine the position of the employee[,] ... an employer seeking out negative feedback on an employee, or condoning or encouraging other employees to complain about her.
HES points out that no Iowa court has held these actions are “materially adverse actions” for purposes of a retaliation claim under the ICRA.
In order to prove retaliation, a plaintiff must show “the employer took adverse employment action against him or her.” Boyle, 710 N.W.2d at 750. We previously held that an adverse employment action is “an action that detrimentally affects the terms, conditions, or privileges of employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employees are not adverse employment actions.” Channon v. United Parcel Serv., Inc., 629 N.W.2d 835, 862 (2001). “[A] wide variety of actions, some blatant and some subtle, can qualify” as adverse employment actions. Id. at 863 (quoting Bryson v. Chi. State Univ., 96 F.3d 912, 916 (7th Cir. 1996)). Adverse action may include “disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period.” Id. (quoting McKenzie v. Atl. Richfield Co., 906 F.Supp. 572, 575 (D. Colo. 1995)). We have also concluded that losing a prestigious title or opportunity for advancement, physically punching an employee, and reducing an employee from full- to part-time can qualify as adverse employment actions. See id. at 865 (constructive demotion); see also Estate of Harris, 679 N.W.2d at 678 (punching employee in chest); City of Hampton, 554 N.W.2d at 536 (reduction of hours). Whether an adverse employment action occurred “normally depended] on the facts of each situation.” Channon, 629 N.W.2d at 862 (quoting Bryson, 96 F.3d at 916); see also Burlington N. & Santa Fe Ry. v. White, 548 U.S. 53, 71, 126 S.Ct. 2405, 2417, 165 L.Ed.2d 345 (2006) (“Materially adverse depends upon the circumstances of the particular case, and ‘should be judged from the perspective of a reasonable person in the plaintiffs position, considering “all the circumstances.” ’ ” (quoting Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81, 118 S.Ct. 998, 1003, 140 L.Ed.2d 201 (1998))).
The Supreme Court in Burlington Northern provided further guidance on what qualifies as an adverse employment action in a retaliation claim. A female employee, Sheila White, was assigned to operate a forklift, a desirable position because it was less arduous and cleaner than other tasks. 548 U.S. at 57-58, 126 S.Ct. at 2409. After White complained about a male employee harassing her, she was moved off forklift duty and reassigned to a more physically demanding position. Id. at 58, 126 S.Ct. at 2409. White filed an EEOC complaint. Id. Shortly thereafter, her supervisor alleged she was insubordinate, and the company suspended her without pay for thirty-seven days. Id. After determining the complaint was unfounded, the company reinstated her with backpay. Id.
Deciding whether White had suffered an adverse employment action, the Court declined to limit a retaliatory adverse action to only those that “affect the terms and conditions of employment.” Id. at 64, 126 S.Ct. at 2412-13. This differed from the Court’s interpretation of adverse action under the antidiscrimination provision, which only prohibited “employment-related” adverse action. Id. at 63, 126 S.Ct. at 2412. This was because the antidiscrimi-nation provision was intended to promote *588 equality in employment opportunities, and therefore, the purpose would be achieved “were all employment-related discrimination miraculously eliminated.” Id. But the Court recognized the retaliation provision’s objective could not likewise be achieved by only prohibiting employment-related harms because “[a]n employer can effectively retaliate against an employee 'by taking actions not directly related to his employment or by causing him harm outside the workplace.” Id.
Thus, the Court took a broader approach, allowing a plaintiff alleging an adverse action was “materially adverse” to prove the action would have “dissuaded a reasonable worker' from making or , supporting a charge of discrimination.” Id. at 68, 126 S.Ct. at 2415 (quoting Rochon v. Gonzales, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The Court elaborated,
We speak of material adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth “a •.general civility code for the American workplace.” An employee’s decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that ,all employees experience. The antiretaliation provision seeks to prevent employer interference with “unfettered access” to Title VII’s remedial mechanisms. It does so by prohibiting employer actions that are likely “to deter victims of discrimination from complaining to the EEOC,” the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.
Id. (citations omitted) (first quoting Oncale, 523 U.S. at 80, 118 S.Ct. at 1002; and then quoting Robinson v. Shell Oil Co., 519 U.S. 337, 346, 117 S.Ct. 843, 848, 136 L.Ed.2d 808 (1997)).
The Court stressed that the “significance of any given act of retaliation will often depend on the particular circumstances.” Id. at 69, 126 S.Ct. at 2415. Under this standard/ the Court held that reassignment to a less desirable job and suspension was an adverse employment action. Id. at 71, 126 S.Ct. at 2417. The Court noted,
Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more timq performing the more arduous duties and less time performing those that are easier or more agreeable.
Id. at. 70-71, 126 S. Ct. at 2416. Still, the Court took pains to recognize that “reassignment of job duties is not automatically actionable” and will “depend[] upon the circumstances of the particular case.” Id. at 71, 126 S.Ct. at 2417. The Court also concluded that although White had received backpay for the time of her suspension, it was still adverse action because “White and her family had to live for 37 days without income. Many reasonable employees would find a month without a paycheck to be a serious hardship.” Id. at 72, 126 S.Ct. at 2417. We find Burlington Northern persuasive and adopt it as the appropriate inquiry for evaluating an adverse employment action under the ICRA.
Burlington Northern, however, does not rescue the .jury instruction here. Even before Burlington Northern, we recognized that adverse employment actions can occur in a variety of situations and “will normally depend on. the facts of each situation.” Channon, 629 N.W.2d at 862 (quoting Bryson, 96 F.3d at 916). To the extent that Burlington Northern broadened the inquiry to situations that do not directly affect *589 the terms or conditions of employment, the jury instruction captured this sentiment, defining adverse action as “anything that might dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.” But the instruction went too far when it effectively told the jury that reprimands or performance improvement plans constituted adverse action as a matter of law. Cases both before and after Burlington Northern have consistently held that “a negative performance review on its own does not constitute an ‘adverse employment- action’ ... unless the review was relied on in making promotion decisions about the employee.” Rebouche v. Deere & Co., 786 F.3d 1083, 1088 (8th Cir. 2015).
Prior to Burlington Northern, in Farmland Foods, when an employer criticized an employee because of the slow pace of his work, we determined that “occasional complaints voiced by an employer about employee performance standards” did not constitute “substantial evidence of a materially adverse employment action.” 672 N.W.2d at 742. We explained that the employee’s internal transfer also did not qualify as an adverse action because “minor changes in working conditions that only amount to an inconvenience cannot support discrimination.” Id. We added, “An employment action is not adverse merely because the employee does not like it or disagrees with it.” Id.
Similarly, in Powell v. Yellow Book USA, Inc., although an employee received three written reprimands after filing a complaint with the Iowa Civil Rights Commission, “she [could] point to no cut in her pay, no reduction in her hours, nor any other significant change to the conditions of her employment.” 445 F.3d 1074, 1079 (8th Cir. 2006). The Eighth Circuit concluded that “formal criticisms or reprimands that do not lead to a change in compensation, responsibilities, or other benefits do not constitute an adverse employment action under Title -VII.” Id. In addition, “placing [an employee] on a ‘performance improvement .plan,’ .without more, [does] not constitute an adverse employment action.” Givens v. Cingular Wireless, 396 F.3d 998, 998 (8th Cir. 2005) (per curiam).
A majority of circuits addressing the question have held that - a reprimand or performance improvement plan, without more, cannot be considered an adverse employment action under Burlington Northern. See Rebouche, 786 F.3d at 1088; see also Jensen-Graf v. Chesapeake Emp. Ins., 616 Fed.Appx. 596, 598 (4th Cir. 2015) (per curiam) (concluding denial of professional development course because employee was on performance improvement plan was not adverse action under Burlington Northern); Barnett v. Athens Reg’l Med. Ctr. Inc., 550 Fed.Appx. 711, 715 (11th Cir. 2013) (per curiam) (“[T]he negative performance evaluation would not, by itself, have deterred a reasonable person from making a charge of discrimination, especially in this case, where such an evaluation, by itself, would not impact his salary or job status.”); Fox v. Nicholson, 304 Fed.Appx. 728, 733 (10th Cir. 2008) (per curiam) (applying Burlington Northern under Americans with Disabilities Act and finding that when employee had lower scores and .negative comments on reviews but was still in satisfactory range, no adverse employment action); Vaughn v. Louisville Water Co., 302 Fed.Appx. 337, 348 (6th Cir. 2008) (stating lower performance reviews may only be adverse actions if they “significantly impact an employee’s wages or professional advancement”); James v. Metro. Gov’t of Nashville, 243 Fed.Appx. 74, 79 (6th Cir. 2007) (concluding poor evaluations not adverse action unless “markedly worse , than earlier ones” and impacted “professional advancement” because they would not *590 have dissuaded a reasonable employee from filing a Title VII claim).
Under the facts of this case, the performance improvement plan, alone, did not cause Haskenhoff material harm either within the workplace or outside of it. Haskenhoff was never suspended, with or without pay. See Burlington N., 548 U.S. at 72, 126 S.Ct. at 2417. Her work hours were not reduced, nor was her pay cut. The performance improvement plan did not affect her professional advancement. See id. at 69, 126 S.Ct. at 2416. Her duties and status remained unchanged, both within the workplace and outside of it. Under her performance improvement plan, Haskenhoff was only required to abide by rules applicable to others in her position. See Fischer v. Andersen Corp., 483 F.3d 553, 556-58 (8th Cir. 2007) (holding that placement on performance improvement plan was not a constructive discharge when employee acknowledged that plan requirements “were largely fair and in conformance with what one would expect from an engineer”).[14] Moreover, Finke and Wendland assured Haskenhoff that if she wanted any revisions, the plan would be changed to reflect her concerns. The timing of the plan and allegations giving rise to it were suspect, but these factors were for the jury to weigh under a correct instruction. The district court erred by instructing the jury the performance improvement plan was an adverse employment action as a matter of law.
“We have on a number of occasions found instructions that unduly emphasized certain evidence were flawed and required reversal.” Alcala, 880 N.W.2d at 710 (quoting Burkhalter v. Burkhalter, 841 N.W.2d 93, 106 (Iowa 2013)). Jury instructions should not comment on specific evidence or erroneously advise the jury “that certain facts are undisputed when there is conflicting evidence on the question.” Locksley v. Anesthesiologists of Cedar Rapids, P.C., 333 N.W.2d 451, 455 (Iowa 1983); see also 89 C.J.S. Trial § 581, at 36 (2012) (“[IJmpermissible comments in jury instructions include those where the court assumes the truth of a material controverted fact or ... withdraws some pertinent evidence from the jury’s consideration.”). For example, in Locksley, we upheld a district court’s refusal to give a jury instruction that defendant was competent as a matter of law because his competence was disputed, and the proposed instruction would have taken a factual determination from the jury. 333 N.W.2d at 455.
Instruction No. 30 provided that certain activities constituted adverse employment actions as a matter of law. The list included matters that no court in Iowa—or the Iowa Civil Rights Commission or EEOC, for that matter—has concluded constitute an adverse employment action as a matter of law. See EEOC Enforcement Guidance on Retaliation and Related Issues (Aug. 25, 2016), https://www.eeoc.gov/laws/ guidance/retaliation-guidance.cfm#_ftnref 113. By stating certain instances of conduct that occurred in this case were examples of adverse employment actions (and thus adverse action as a matter of law), the instruction took that factual determination away from the jury and relieved *591 Haskenhoff of her burden of proof on that element of the retaliation claim. See Anderson, 620 N.W.2d at 267 (providing examples of breaches of duty of care in negligence action takes determination away from the jury because jury must be the one to apply the legal standard to the facts). We conclude the adverse-action instruction misstated the law and unduly emphasized certain evidence. This prejudicial error requires a new trial.
E. Whether the Constructive Discharge Instruction Misstated the Law. We next address the district court’s instruction on constructive discharge. “Constructive discharge exists when the employer deliberately makes an employee’s working conditions so intolerable that the employee is forced into an involuntary resignation.” Van Meter Indus. v. Mason City Human Rights Comm’n, 675 N.W.2d 503, 511 (Iowa 2004) (quoting First Judicial Dist. Dep’t of Corr. Servs. v. Iowa Civil Rights Comm’n, 315 N.W.2d 83, 87 (Iowa 1982)). The policy behind constructive discharge is simple: an employer “should not be able to accomplish indirectly what the law prohibits directly.” 1 Barbara T. Lindemann et ah, Employment Discrimination Law 21-33 (5th ed. 2012) [hereinafter Lindemann].
In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted “end runs” around wrongful discharge and other claims requiring employer-initiated terminations of employment.
Balmer v. Hawkeye Steel, 604 N.W.2d 639, 641 (Iowa 2000) (quoting Turner v. Anheuser-Busch, Inc., 7 Cal.4th 1238, 32 Cal.Rptr.2d 223, 876 P.2d 1022, 1025 (1994) (en banc)). Employees often allege discriminatory constructive discharge because it allows recovery of backpay. Van Meter Indus., 675 N.W.2d at 510-11. “[Trivial or isolated acts of the employer are not sufficient to support a constructive discharge claim.” Id. at 511. “Rather, the ‘working conditions must be unusually “aggravated” or amount to a “continuous pattern” before the situation will be deemed intolerable.’ ” Id. (quoting Haberer v. Woodbury County, 560 N.W.2d 571, 576 (Iowa 1997)). Constructive discharge is not its own cause of action, but must be asserted under a common law or statutory framework, such as the Iowa Civil Rights Act. See Balmer, 604 N.W.2d at 642 (outlining that constructive discharge can be a form of wrongful discharge or asserted under statute allowing recovery). As such, it can either be alleged under a discrimination claim (“The employer made my working conditions intolerable by discriminating on the basis of an unfair characteristic.”), or as an adverse action under a retaliation theory (“The employer retaliated against me by making my working conditions intolerable.”). As is the case here, “[c]onstructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful retaliation.” West v. Marion Merrell Dow, Inc., 54 F.3d 493, 497 (8th Cir. 1995).
HES asserts three errors in the constructive discharge instruction. First, HES contends that it was error to instruct the jury, “The employer need not really want the employee to quit.” Second, HES argues the district court erred by inserting a subjective standard into the definition of constructive discharge. Third, HES assigns error to the district court’s refusal to allow an instruction stating “conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem.”
*592 1. Employer need not want the employee to quit. We conclude there was no error in the district court’s instruction on the principle that “[t]he employer need not really want the employee to quit.” In Van Meter Industries, Jane Sires quit her job with Van Meter Industries after being passed over for a promotion and “relegated to the operations side of the business where there was no reasonable likelihood of advancement into a manager position” because of her sex. 675 N.W.2d at 511. Sires conceded she did not think Van Meter Industries “really wanted her to quit.” Id. at 512. We stated,
Although it may be undisputed that VMI wanted Sires to stay on the job, this fact does not preclude a finding that the company deliberately rendered Sires’ working conditions so intolerable that a reasonable employee in Sires’ position would resign.
Id. It is enough “that the employee’s resignation was a reasonably foreseeable consequence of the insufferable working conditions created by the employer.” Id. We reversed the district court’s finding there was not substantial evidence Sires was constructively discharged. Id. at 513. Pursuant to Van Meter Industries, the jury was correctly instructed the employer need not really want the employee to quit to claim constructive discharge.
2. Objective standard for constructive discharge. HES next asserts error because the constructive discharge instruction wrongly directed the jury to consider i subjective standard. The instruction stated, “The employee must show that she was subjected to sexual harassment or retaliation [that] made her believe there was. no chance for fair treatment at Homeland.” (Emphasis added.) We conclude it should have said, “made her reasonably believe.”
The test for constructive discharge is objective, evaluating whether a reasonable person in the employee’s position would have been compelled to resign and whether an employee reasonably believed there was no possibility that an employer would respond fairly. Id. at 511. “The issue thus is not how plaintiff felt but whether a reasonable person in his position would have felt the same way.” Reihmann v. Foerstner, 375 N.W.2d 677, 683 (Iowa 1985).
“[W]orking conditions must be unusually ‘aggravated’ or amount to a ‘continuous pattern’ before the situation will be deemed intolerable.” Van Meter Indus., 675 N.W.2d at 511 (quoting Haberer, 560 N.W.2d at 576). In Haberer, a police officer resigned after he was placed on a paid, eighteen-month suspension followed by an unpaid thirty-day suspension pending a criminal investigation against him. 560 N.W.2d at 573. When the officer returned to duty, he was reassigned to office work. Id. After receiving notice his wages would be garnished for unpaid child support, the officer resigned. Id. We held, as a matter of law, no constructive discharge had occurred. Id. at 578. Haberer’s reassignment to office work was not “(1) a change in grade, (2) inconsistent with or outside the scope of his job description, (3) a decrease in pay or prestige, (4) impossible to do, or (5) anything beyond a mere ‘difficulty’ because of a lack of ‘experience.’ ” Id. at 577. We noted,
Under the cases, an employee cannot simply “quit and sue,” claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer..,.
... Every job has its frustrations, challenges, ... and disappointments; *593 these inhere in the nature of work. [An employee is not] guaranteed a working environment free of stress. •
Id. at 575-76 (alteration in original) (quoting Turner, 32 Cal.Rptr.2d 223, 876 P.2d at 1026-27).
The first paragraph of the constructive discharge instruction' focused on whether the conditions were “intolerable so that the employee reasonably feels forced to quit.” But the second paragraph implied that “intolerable” conditions equated to the employee’s subjective belief there was' “no chance for fair treatment at Homeland.” This was not a correct statement of law. See Van Meter Indus., 675 N.W.2d at 511—12 (stating that constructive discharge" results when “employee has no recourse within the employer’s organization or ‘reasonably believes there is no chance for fair treatment’ ” (emphasis added) (citation omitted) (quoting Kimzey v. Wal-Mart Stores, Inc., 107 F.3d 568, 574 (8th Cir. 1997))).
Nevertheless, omitting “reasonably” in one sentence of the constructive discharge instruction was harmless when the instructions are read as a'whole. “[W]e look to the instructions as a whole and do not require perfection.” Rivera, 865 N.W.2d at 902. Another instruction stated,
INSTRUCTION NO. 34
INTOLERABLE WORKING CONDI: TIONS-DEFINED
Working conditions are intolerable if a reasonable person in the plaintiffs situation would have deemed resignation the only reasonable alternative.
The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.
' The adverse working conditions must be unusually “aggravated” or amount to a “continuous pattern” before the situation will be deemed intolerable. A single, trivial or isolated act is insufficient to support a. constructive - discharge claim.
The instructions on constructive discharge mentioned the standard of “reasonable belief’ or “reasonable employee” no less than five times. In addition, the sentence immediately following the offending statement in the‘marshaling instruction clarified the objective standard, elaborating that the employee must “reasonably believe” there is no possibility of fair treatment. Reading the instructions together “leads to the inevitable conclusion the jury could not have misapprehended the issue” on the constructive discharge objective standard. Moser v. Stallings, 387 N.W.2d 599, 605 (Iowa 1986).
3. Reasonable chance to resolve the problem. HES raises a final point that the district court should have given its requested instruction stating that “conditions cannot be .considered intolerable unless the employer has been given a reasonable chance to resolve the problem.” We conclude HES’s requested instruction was a correct statement of the law and was not adequately embodied in other instructions. Therefore, on this record, it was reversible error for the district court to refuse to give that instruction.
In Van Meter Industries, we squarely decided that an employee" must give an employer “a reasonable' chance to resolve the problem.” 675 N.W.2d at 511. Sires reported to one of her superiors and to the director of human resources before resigning that she felt she “‘had reached [the] highest level [she] was going to be allowed to go’ and that she was considering resigning.” Id. at 508 (alterations in original). Her superior asked her to “wait,” and the human resources director told her to *594 “hang in there.” Id. A week passed with no response. Id. Sires then received a phone call in which she was given “vague reassurance[s]” and informed that if the individual who made the promotion decision “had it to do over again, he would still promote [the male employee] over her.” Id. Sires resigned two days later, and Van Meter Industries accepted her resignation without protest. Id. The commission found that Sires had been constructively discharged. Id. at 509. The district court reversed, believing “Sires had not given VMI ‘any opportunity to work on the problem before she quit,’ ” among other reasons.[15] Id. at 510.
On review, we began by noting that “conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem.” Id. at 511. We then tempered this statement: “On the other hand, an employee need not stay if he or she reasonably believes there is no possibility the employer will respond fairly.” Id. Examining Sires’ constructive discharge claim, we observed she gave Van Meter Industries a reasonable opportunity to remedy the discrimination. Id. at 513. Although she waited only one month before quitting, Sires had a reasonable belief her employer would not resolve the problem:
In the weeks between Meyers’ promotion and Sires’ resignation the company not only took no action to investigate Sires’ complaints, it gave no indication that it intended to conduct an inquiry. The company’s indifference was further demonstrated by the fact Sires was referred to the individual who made the discriminatory promotion decision to seek a resolution of her grievance. This individual, rather than assuring Sires that appropriate and prompt remedial action would be taken, informed her that he would make the same decision again if he had it to do over and reaffirmed that the company saw her future in operations.
Id. (citation omitted). Because Sires demonstrated a reasonable belief her employer would not resolve the problem, we concluded,
[W]e cannot say under the specific circumstances of this particular case that she acted precipitously. A review of the evidence shows this case is not one where the company did not have sufficient time to rectify its wrong.... Rather, this case presents a situation where the company, when given the opportunity, chose to perpetuate its discriminatory practices.

Id.

We supported our decision by citing Iowa precedent and precedent from the Eighth Circuit. See id. at 511 (citing Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1159 (8th Cir. 1999), abrogated in part on other grounds by Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011); First Judicial Dist. Dep’t of Corr. Servs., 315 N.W.2d at 89). In First Judicial District Department of Correctional Services, We denied recovery on a race and disability constructive discharge *595 claim when the department of corrections issued an order restricting an African-American blind counselor’s access to the jail due to a security risk. 315 N.W.2d at 85. The employee quit one day later. Id. We held the employee “was precipitous; she overreacted.” Id. at 89. She “failed to make a good faith effort to determine whether the restriction from the jail would render her employment as onerous as she now contends,” and the record contained nothing showing the restriction was permanent. Id. Her “immediate resignation ... deprived [the employer] of the opportunity to investigate and remedy the situation.” Id.; see also Haberer, 560 N.W.2d at 577 (denying recovery based in part on employee’s “rash and intemperate” act of resigning); cf. Johnson v. Dollar Gen., 880 F.Supp.2d 967, 998 n.6 (N.D. Iowa 2012) (“[T]he Iowa Supreme Court has observed that ‘conditions will not be considered intolerable [so as to constitute constructive discharge] unless the employer has been given a reasonable chance to resolve the problem,’ and Johnson gave Dollar General and Williams no such opportunity before resigning.” (alteration in original) (citation omitted) (quoting Van Meter Indus., 675 N.W.2d at 511)), aff'd, 508 Fed.Appx. 587 (8th Cir. 2013).
The Eighth Circuit has held that to demonstrate constructive discharge, an employee must show that a “reasonable person would find the working conditions intolerable.” Phillips v. Taco Bell Corp., 156 F.3d 884, 890 (8th Cir. 1998). “Such intolerability ... is judged by an objective standard, not the plaintiffs subjective feelings.” Id. “To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly.” Tidwell v. Meyer’s Bakeries, Inc., 93 F.3d 490, 494 (8th Cir. 1996). Thus, “[a]n employee who quits without giving [the] employer a reasonable chance to work out a problem has not been constructively discharged.” Id. Indeed, “passivity in the face of working conditions alleged to be intolerable is often inconsistent with the allegation.” Lindale v. Tokheim Corp., 145 F.3d 953, 955 (7th Cir. 1998). But “[i]f an employee quits because she reasonably believes there is no chance for fair treatment, there has been a constructive discharge.” Kimzey, 107 F.3d at 574.
Peggy Kimzey, an employee at Wal-Mart, complained to management several times about repeated harassment by her supervisor. Id. at 571. Management told her they were aware of the problem but took no action to investigate or follow up on the complaint. Id. Even after Kimzey resigned because of her supervisor’s continued conduct, her manager “did not indicate that he would investigate her complaints or take any other action required by Wal-Mart’s open door policy.” Id. at 572. The Eighth Circuit held that “[a] reasonable jury could find that the continuing harassment and management’s indifference rendered Kimzey’s working conditions intolerable and forced her to quit.” Id. at 574-75. It highlighted the evidence that members of Wal-Mart knew Kimzey was being harassed, but “generally ignored those complaints.” Id. at 574. Because Kimzey demonstrated a reasonable belief there was no chance of fair treatment at Wal-Mart, the Eighth Circuit found no error in submitting the constructive discharge claim to the jury. Id. at 575; see also Sanders v. Lee Cty. Sch. Dist. No. 1, 669 F.3d 888, 894 (8th Cir. 2012) (finding discriminatory constructive discharge claim supported when employee reasonably believed no chance for fair treatment because employer failed to respond to repeated requests for information about reassignment); Henderson v. Simmons Foods, Inc., 217 F.3d 612, 617 (8th Cir. 2000) (affirming constructive discharge claim when employee “essentially is left *596 with no choice other than the termination of her employment” due to employer’s failure to investigate or respond to knowledge of harassment).
By contrast, in Alvarez v. Des Moines Bolt Supply, Inc., the Eighth Circuit held the district court properly granted summary judgment on a constructive discharge claim when an employee failed to notify the employer of retaliatory harassment. 626 F.3d 410, 418 (8th Cir. 2010). Veronica Alvarez notified her employer of inappropriate sexual conduct by her coworker. Id. at 413-14. Her employer investigated the claims and suspended the harassing coworker. Id. at 415. Other coworkers then began to harass her in retaliation for her complaint. Id. However, Alvarez failed to notify the employer about the postsuspension harassment before she resigned. Id. The Eighth Circuit concluded Alvarez had given her employer “no reasonable opportunity to remedy the problem.” Id. at 419. Alvarez argued she should be excused from the notice requirement because her prior complaint showed she “had no chance for fair treatment if she complained again about harassment.” Id. But “[p]art of an employee’s obligation to be reasonable,” the court held, “is an obligation not to assume the worst, and not to jump to conclusions too fast.” Id. (quoting Smith v. Goodyear Tire & Rubber Co., 895 F.2d 467, 473 (8th Cir. 1990)). Thus, her prior complaint “did not excuse Alvarez from at least notifying DMB about the continued misconduct to see how the company would respond.” Id.
Other cases have similarly held, unless the employee demonstrates a reasonable belief there is no chance for fair treatment, he or she must give the employer a chance to respond before resigning due to retaliatory conduct.[16] See Phillips, 156 F.3d at 891 (determining employee not constructively discharged when manager retaliated against her by speaking to her in “nasty” tone because she “fail[ed] to give Taco Bell a fair opportunity to demonstrate that it *597 had remedied the, situation”); Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1247-48 (8th Cir. 1998) (holding employee was not constructively discharged when she complained about retaliation but failed to give the employer’s method for solving the problem a chance); Tidwell, 93 F.3d at 496 (concluding employee who quit the day after seeing allegedly retaliatory schedule change not constructively discharged because he failed to give employer “an opportunity to explain the situation or remedy it”). Such- a rule recognizes that “a reasonable waiting period is inversely related to the severity of the situation,” Watson v. Heartland Health Labs., Inc., 790 F.3d 856, 864 (8th Cir. 2015), and there may be cases of severe harassment or retaliation when it is reasonable for the employee to resign immediately. It also acknowledges there may be times when the employee can demonstrate a complaint would be fruitless, such as when the prescribed method of recourse is through the alleged harasser or when an employer' has failed to respond to previous instances, of harassment. See, e.g., Van Meter Indus., 675 N.W.2d at 513 (“Sires was referred to the individual who made the discriminatory promotion decision to seek a resolution of her grievance”).
“[A]ntidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable.” Poland v. Chertoff, 494 F.3d 1174, 1184 (9th Cir. 2007). We empathize with the fact that in many cases coming forward with allegations of retaliation may seem difficult. See Cathy Shuck, That’s It, I Quit: Returning to First Principles in Constructive Discharge Doctrine, 23 Berkeley J. Emp. & Lab. L. 401,429-30 (2002) (“The most frequently cited reason for failing to report harassment is fear of negative outcomes—fear that the employee will lose her job, not be believed, or ‘simply because it will not help [her] situation[].’” (alterations in original) (quoting Theresa, M. Beiner, Sex, Science and Social Knowledge: The Implications of Social Science Research on Imputing Liability to Employers for Sexual Harassment, 7 Wm. & Mary J. Women & L. 273, 317 (2001))). But countervailing policy considerations counsel us the burden placed on the employee is reasonable. A preeminent treatise on employment law explains,
Courts generally require that the employee must give higher levels of management the opportunity to correct an adverse situation before quitting and claiming constructive discharge. The evident purpose of the requirement is to allow the employer as an entity—as opposed to, for example, an individual (and perhaps aberrational) supervisor—to redress the problem. However, to avoid a finding of constructive discharge, the employer’s response must be adequate; the employee need not suffer prolonged harassment or discrimination.
Lindemann, at 21-44 to 21-45 (footnotes omitted). Moreover, an employee can escape the requirement of coming forward by alleging there would have been no “chance for fair treatment” in the face of a complaint. Kimzey, 107 F.3d at 574.
Courts have consistently required “something more” for constructive discharge claims than for ordinary discrimination or retaliation. Pa. State Police v. Suders, 542 U.S. 129, 147, 124 S.Ct. 2342, 2354, 159 L.Ed.2d 204 (2004). Constructive discharge occurs when the working conditions deteriorate, as a result of discrimination or retaliation, “to the point that they become ‘sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn *598 a livelihood and to serve his or her employer.’ ” Brooks v. City of San Mateo, 229 F.3d 917, 930 (9th Cir. 2000) (quoting Turner, 32 Cal.Rptr.2d 223, 876 P.2d at 1026). These discriminatory or retaliatory actions are best handled within the employment relationship. Poland, 494 F.3d at 1184. The employee can recover for any additional acts of harassment suffered until he resigns. See Green v. Brennan, 578 U.S. -, -, 136 S.Ct. 1769, 1782, 195 L.Ed.2d 44 (2016) (holding the claim of constructive discharge does not accrue until an employee resigns).
The First, Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits consider whether the employee reasonably gave the employer an opportunity to respond before claiming constructive discharge. See, e.g., EEOC v. Kohl’s Dep’t Stores, Inc., 774 F.3d 127, 134 (1st Cir. 2014) (holding employee failed to meet “reasonable person” element when her “choice to resign was ‘grossly premature, as it was based entirely on [her] own worst-case-scenario assumption’ ” (alteration in original)); Trierweiler v. Wells Fargo Bank, 639 F.3d 456, 461 (8th Cir. 2011) (“We have consistently recognized that an employee is not constructively discharged if she ‘quits without giving [her] employer a reasonable chance to work out a problem.’” (alteration in original) (quoting Brenneman v. Famous Dave’s of Am., Inc., 507 F.3d 1139, 1144 (8th Cir. 2007)); Aryain v. Wal-Mart Stores Texas LP, 534 F.3d 473, 482 (5th Cir. 2008) (concluding employee could not recover because she “assumed the worst and made no effort to allow Wal-Mart the opportunity to remedy the problems she identified”); Barker v. YMCA of Racine, 18 Fed.Appx. 394, 399 (7th Cir. 2001) (“Employees who quit without giving their employer a reasonable chance to resolve a problem have not been constructively discharged. Here, Ms. Barker did not try to resolve her work problems—she merely walked away from her job without notice .... ” (Citation omitted.)); Yearous v. Niobrara Cty. Mem’l Hosp., 128 F.3d 1351, 1357 (10th Cir. 1997) (holding no constructive discharge when plaintiffs only waited brief time before resigning and “unreasonably refused to explore any option short of resignation”); Kilgore v. Thompson & Brock Mgmt., Inc., 93 F.3d 752, 754 (11th Cir. 1996) (“A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation.”); Bozé v. Branstetter, 912 F.2d 801, 804-05 (5th Cir. 1990) (per curiam) (concluding employee was not constructively discharged when he failed to pursue internal grievance procedures); see also DeWalt v. Davidson Serv./Air, Inc., 398 S.W.3d 491, 501 (Mo. Ct. App. 2013) (“Reasonableness requires an employee not to assume the worst, and not to jump to conclusions too quickly.”).[17] As Linde-mann states,
*599 The general rule is that a reasonable employee must remain and fight discrimination on the job. Indeed, even when the employee is faced with what he anticipates will be an intolerable job environment, courts generally hold that the employee should not quit precipitously, but rather should remain to see whether those fears in fact do materialize. Moreover, an employee cannot simply speculate that intolerable conditions will develop, that an impending discharge will occur, or that management will ignore the problem.
Lindemann, at 21-41 to 21-42 (footnotes omitted).
Haskenhoff failed to establish as a matter of law that it would have been fruitless to give HES management more time to respond. To the contrary, HES was actively engaged in responding to her complaint when she quit. It was for the jury to decide, under proper instructions, whether she jumped the gun, or rather, was constructively discharged. A reasonable employee has “an obligation not to assume the worst and not to jump to conclusions too quickly.” Brenneman, 507 F.3d at 1144 (quoting Duncan v. Gen. Motors Corp., 300 F.3d 928, 935 (8th Cir. 2002)). “The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee.” Haberer, 560 N.W.2d at 575 (quoting Turner, 32 Cal.Rptr.2d 223, 876 P.2d at 1026).
Instruction No. 33 omitted language requested by HES and required under our precedent stating the employee must give the employer “a reasonable chance to resolve the problem.” Van Meter Indus., 675 N.W.2d at 511. That omission constituted prejudicial error.
F. Whether the Expert Testimony of Dr. Fitzgerald Should Have Been Excluded. Because the issue is likely to arise on remand, we will discuss whether the district court abused its discretion by allowing the testimony of Dr. Fitzgerald. Iowa Rule of Evidence 5,702 (2014)[18] provides,
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.
HES argues expert testimony by Dr. Fitzgerald should not have been admitted because it “invade[s]' the province of the court to determine the applicable law and to instruct the jury as to that law.” In re Det. of Palmer, 691 N.W.2d 413, 419 (Iowa 2005) (quoting Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir. 1985)), overruled on other grounds by Alcala, 880 N.W.2d at 708 n.3. HES specifically objects to Dr. Fitzgerald’s testifying to “the requirements and standards for an effective sexual harassment program and whether [HES] ’s harassment prevention and remediation program was consistent with those standards.” HES also objects to Dr. Fitzgerald’s testimony about what a reasonable company would do. Haskenhoff states that Dr. Fitzgerald’s testimony pro *600 vided helpful insight based on reasonable industry standards and did not delve into instruction upon the law.
HES’s challenge to Dr, Fitzgerald’s testimony focused on the linkage to erroneous jury instructions. Because we are reversing and ordering a new trial based on the instructional errors, the admissibility of her testimony will be in a somewhat different context on remand. We review the general parameters of expert testimony.
“An opinion is not objectionable just because it embraces an ultimate issue.” Iowa R. Evid. 5.704 (2017). We favor a “liberal view on the admissibility of expert testimony.” Ranes, 778 N.W.2d at 685. Whether an opinion should be excluded on the basis that it is couched in legal terms “depends on ‘whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.’ ” In re Det. of Palmer, 691 N.W.2d at 420 (quoting Torres, 758 F.2d at 151). If so, the testimony should be excluded. Id. For example, questions such as whether a defendant was negligent or not negligent are improper because “[ejxperts are not to state opinions as to legal standards.” Iowa R. Evid. [5.]704 committee cmt. (1988).
The district court allowed Dr. Fitzgerald’s testimony, finding she was “qualified as an expert on the subjects presented, as provided by Iowa Rule of Evidence 5.702.” Dr. Fitzgerald testified she was hired for two reasons: (1) to speak with Haskenhoff and evaluate whether she displayed typical victim behavior in response to harassment, and (2) to examine HES’s policies and procedures on sexual harassment and opine whether they met accepted standards in the field of human resources. She opined that Haskenhoff suffered from major depressive disorder and posttraumatic stress disorder, described these conditions for the jury, and stated why they may be caused by harassing behavior. She testified about whether this was common for victims of harassment. She also testified about what a “reasonable” company should do to prevent sexual harassment according to human resources standards and whether HES conformed to those standards. She skirted close to the line prohibiting testimony on legal conclusions:
A, ... [T]here’s a distinction between—that I should make here—between violation of a company’s policy and violation of the law.
Because they’re not—although there’s a great deal of overlap, they’re not always exactly the same. So there are things that can violate a company’s policy and not violate the law....
[[Image here]]
Q. Okay. “The standard of professional practice says an investigation,” and then you set out steps a competent investigator would take in order to conduct a real investigation into this or any other matter. And what are those steps? A. Well, I probably should have said “should” instead of must, because it’s not the law or anything. But the common practice recommendation....
[[Image here]]
Q. And your testimony doesn’t purport to tell the jurors what the law is proscribing sex harassment, does it? A. No, I do not speak to legal issues.
Testimony that particular conduct violated the ICRA clearly would be an inadmissible legal conclusion.
Expert testimony on the standard of care or standard of practice is generally permitted in negligence actions. See Alcala, 880 N.W.2d at 709 (collecting cases requiring evidence of an employer’s standard of care and its breach to recover under a negligent-training theory); Oswald *601 v. LeGrand, 453 N.W.2d 634, 635 (Iowa 1990) (noting that in a professional negligence action, “[o]rdinarily, evidence of the applicable standard of care—and its breach—must be furnished by an expert”); Brandt v. Richter, 159 N.W.2d 471, 474 (Iowa 1968) (allowing testimony of farm safety expert and discussing precedent rejecting argument such testimony improperly altered the standard of care). But expert testimony as to-a legal conclusion is inadmissible in an ordinary negligence action. See, e.g., Bell v. Cmty. Ambulance Serv. Agency, 579 N.W.2d 330, 338 (Iowa 1998) (affirming exclusion of opinion testimony of law enforcement trainer that ambulance driver’s “actions were highly dangerous and likely to cause injury”); Terrell v. Reinecker, 482 N.W.2d 428, 430 (Iowa 1992) (holding it was reversible error to allow investigating police officer to testify to the legal conclusion that plaintiff “failed to yield the right-of-way”). We have not previously decided where the line is drawn in a hostile-work-environment case. We conclude the district court did not abuse its discretion in allowing Dr. Fitzgerald’s testimony on the record made at the first trial.
IY. Disposition.
For those reasons, we reverse the district court’s ruling denying HES’s motion for new trial, vacate the judgments for plaintiff, and remand the case for a new trial consistent with this opinion.
DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.
Mansfield and Zager, JJ., join this opinion. Cady, C.J., files a concurrence in part and dissent in part. Appel, J., files a separate concurrence in part and dissent in part in which Wiggins and Hecht, JJ., join and Cady, C.J., joins in part.

. Haskenhoff posted on social media two days later to a friend, "[J]ust wanted to let you know that [I] quit Homeland yesterday without giving any notice, had enough of Kevin's bullshit vulgarity and juvenile behavior and favoritism ... followed your lead LOL[.]”

. It has been suggested that we should not rely on federal law because Iowa civil rights *572 statutes were enacted before Title VII. The Iowa legislature, however, did not expressly include a hostile-work-environment provision in the ICRA. See Iowa Code § 216.6(1). Rather, the claim has been developed through our caselaw, beginning in 1990, based expressly on Title VII precedent. We first recognized a hostile-work-environment claim for sex discrimination in Lynch v. City of Des Moines, 454 N.W.2d 827, 833 (Iowa 1990), relying on Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Commission, 394 N.W.2d 375, 378 (Iowa 1986). Chauffeurs, in turn, delineated the elements of a racial hostile-work-environment harassment claim, relying on Henson v. City of Dundee, 682 F.2d 897, 909 (11th Cir. 1982), a Federal Title VII case, for the appropriate framework under the ICRA. Chauffeurs, 394 N.W.2d at 378, 381 (holding union liable when members harassed African-American man with racial epithets and threatening actions). In Meritor Savings Bank, FSB v. Vinson, the Supreme Court also relied on Henson to adopt the framework for a Title VII hostile-work-environment claim for sex discrimination. 477 U.S. 57, 66-67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986). Henson states that to hold an employer responsible for "creating or condoning [a hostile] environment at the workplace,” the plaintiff must prove, among other things, "the employer knew or should have known of the harassment in question and failed to take prompt remedial action.” 682 F.2d at 901, 905.

. It has been suggested that Vance created two types of negligence liability, negligence in failing to prevent the harassment and negligence in failing to remedy it. But the standard for both negligent failure to prevent and negligent failure to remedy is the same: an employer is only liable if he knows or should have known of the harassment and failed to take prompt measures to rectify it. See, e.g., Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 333-34 (4th Cir. 2003) (“[T]he employer may be liable in negligence if it knew or should have known about the harassment and failed to take effective action to stop it." (Emphasis added.)); Sharp, 164 F.3d at 929 ("An employer may be-liable for sexual harassment if it ‘knew or should have known of the harassment in question and failed to take prompt remedial action.’” (quoting Williamson v. City of Houston, 148 F.3d 462, 464 (5th Cir. 1998)); Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1037 (7th Cir. 1998) ("[E]mployers are liable for a co-employee’s harassment only ‘when they have been negligent either in discovering or remedying the harassment.’ An employer’s legal duty in co-employee harassment cases will be discharged if it takes ‘reasonable steps to discover and rectify acts of sexual harassment by its employees,’ ” (citation omitted) (quoting Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997))); Spicer v. Commw. of Va., Dep’t of Corr., 66 F.3d 705, 710 (4th Cir. 1995) ("On the fourth element for establishing employer liability, we have repeatedly held that an employer cannot be held liable for isolated remarks of its employees unless the employer ‘knew or should have known of the harassment, and took no effectual action to correct the situation.’ ” (quoting Katz v. Dole, 709 F.2d 251, 256 (4th Cir. 1983)); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 677 (10th Cir. 1998) (stating it was an "essential element for employer liability” that the plaintiff establish the employer "inadequately responded to incidents of harassment of which it knew or should have known’’); Paroline v. Unisys Corp., 879 F.2d 100, 106 (4th Cir. 1989) ("In a hostile environment claim such as we have here, an employer is liable for one employee’s sexual harassment of another worker if the employer had ‘actual or constructive knowledge of the existence of a sexually hostile working environment and took no *577 prompt and adequate remedial action.' “ (quoting Swentek v. USAIR, Inc., 830 F.2d 552, 558 (4th Cir. 1987) (emphasis added))), vacated in part on other grounds, 900 F.2d 27 (4th Cir. 1990).
The employer’s knowledge and response are key: if the; employer did not have notice of the harassment, either actual or constructive, the employer is not liable. If an employer is negligent in failing to discover workplace harassment, the employee proceeds under a should-have-known framework, but the employer's responsive actions are still relevant. See, e.g., Sharp, 164 F.3d at 930 (analyzing employer’s constructive knowledge of conduct and concluding it could be liable because it should have known of harassment and tolerated it); Adler, 144 F.3d at 673, 676-77; Paroline, 879 F.2d at 107 (stating that employee must prove the employer should have reasonably anticipated harassment because of its pervasiveness and that the employer "failed to take action reasonably calculated to prevent such harassment”). Here, however, it is undisputed'that HES had actual knowledge of the harassment—Haskenhoff complained twice. Thus, the jury should have been instructed that HES was liable only if it failed to take prompt responsive action: ‘'

. See Rock v. Blaine, No. 8:14-CV-1421 MAD/CHF, 2015 WL 3795886, at *1, *5 (N.D.N.Y. June 17, 2015) (noting employer is liable when negligence "perpetuates” a hostile environment, and despite plaintiff's several complaints to supervisors, harasser’s conduct "was not remedied”); Killis v. Cabela’s Retail II, Inc., No. 13 C 6532, 2015 WL 128098, at *13 (N.D. Ill. Jan. 8, 2015) (determining that under negligence theory for supervisor liability, employer’s comprehensive and immediate response to plaintiff’s complaint was a "fundamental obstacle” to her recovery (quoting Muhammad v. Caterpillar, Inc., 767 F.3d 694, 698 (7th Cir. 2014)); Schmidlin v. Uncle Ed's Oil Shoppes, Inc., No. 2:13-CV-10552, 2014 WL 3809415, at *11 (E.D. Mich. Aug. 1, 2014) ("To establish notice of and negligent failure to address harassment, an employee must show that ‘the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment and failed to implement prompt and appropriate corrective action.’ " (Emphasis added.) (quoting Kauffman v. Allied Signal, Inc., 970 F.2d 178, 183 (6th Cir. 1992))); O'Connell v. Peppino’s Catering Co., LLC, No. 1:13-CV-384, 2014 WL 794657, at *8 (W.D. Mich. Feb. 27, 2014) (noting under state standard employer could be liable “only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action” (quoting Elezovic v. Ford Motor Co., 472 Mich. 408, 697 N.W.2d 851, 861 (2005))); Rios DaSilva v. One, Inc., 980 F.Supp.2d 148, 163 n.1 (D.P.R. 2013) (stating Vance serves to remind practitioners “the employer is always liable if he was negligent in not taking action” (emphasis added)).

. See Pattern Jury Instruction for Cases of Emp’t Discrimination for the Dist. Cts. of the U.S. Ct. of Appeals for the First Circuit 2.3 (2011) (requiring plaintiff to prove six elements, including “Fifth, [defendant; management level employees of defendant] either knew or should have known of the harassment; and Sixth, [defendant; management level employees of defendant] failed to take prompt and appropriate remedial action” (em- ' phasis added) (footnote omitted)); Third Circuit Model Civil Jury Instruction 5.1.5 (2016) ("You must find for [defendant] if you find that [defendant] has proved both of the following elements by a preponderance of the evidence; First, [Defendant] exercised reasonable care to prevent harassment in the workplace on the basis of [protected status], and also exercised reasonable care to promptly correct any harassing behavior that does occur.” (Emphasis added.)); Fifth Circuit Pattern Civil Jury Instruction 11.4 (2014) (“Plaintiff [name] must prove that; a. the harassment was known by or communicated to a person who had the authority to receive, address, or report the complaint, ... or the harassment was so open and obvious that Defendant [name] should have known of it; and b. Defendant [name] failed to take prompt remedial action designed to stop the harassment.” (Emphasis added.)); Fed. Civil Jury Instruction of the Seventh Circuit 3.04 (2015) (stating plaintiff must prove “seven things by a preponderance of the evidence; ... 7. Defendant did not take reasonable steps to [correct the situation]/[prevent harassment from recurring”] (emphasis added)); Model Civil Jury Instruction for the Dist, Cts. of the Eighth Circuit 8.42 (2017) (requiring plaintiff to show seven elements, including “Seventh, the defendant failed to take prompt and appropriate corrective action to end the harassment”); Model Civil Jury Instructions for the Dist. Cts. of the Ninth Circuit 10.7 (2017) (“The plaintiff has the burden of proving both of the following elements by a preponderance of the evidence; ... 2. the defendant or a member of the defendant’s management knew or should have known of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment." (Emphasis added.)).

. Nor is the plaintiff's burden of proof addressed in Instruction No. 22, entitled "Existence of Official Policies—Explained,” which told the jury that they could "consider whether the defendant exercised reasonable care to"
[a] Monitor the workplace;
[b] Provide a system for making complaints;
[c] Encourage employees who believe they are being harassed to complain;

[A] Conduct prompt, thorough and impartial investigations into any potential sexual harassment they become aware of, whether it is through a complaint or observation or hearsay;

[e] Reasonably assure that any person who reports sexual harassment will not suffer retaliation;
[f] Communicate their harassment policy to employees so employees will understand what they may and may not do in the workplace;
[g] Educate the workforce, especially members of management, with appropriate training to avoid committing sexual harassment. ...
(Emphasis added.) This instruction allowed the jury to find for Haskenhoff if HES was negligent in any of the above respects, even if the jury found the employer in fact took prompt and appropriate remedial action to end the harassment.

. Hillrichs v. Avco Corp. is not to the contrary. 478 N.W.2d 70 (Iowa 1991), overruled on other grounds by Reed v. Chrysler Corp., 494 N.W.2d 224, 230 (Iowa 1992), overruled by Jahn v. Hyundai Motor Co., 773 N.W.2d 550, 558-60 (Iowa 2009)). There, we determined a uniform jury instruction on ordinary care adequately conveyed the proper legal concept to the jury because it referred to care that "a reasonably careful person would use under similar circumstances." Id. at 74. We noted that the words “under similar circumstances” allowed the standard to "adjustf] to both the status of the actor and the circumstances that the actor faces.” Id. We continued, "These are matters that may be adequately conveyed to the jury by the evidence and by argument of counsel under the instruction that the court gave.” Id. Hillrichs did not involve the omission of an element of proof from the marshaling instruction.

. Because it may arise on remand, we clarify Haskenhoff cannot prove that HES "knew or should have known” and failed to take remedial action by showing only that Howes "knew what he was doing” when he behaved inappropriately toward Haskenhoff. For example, the following exchange took place between Wendland and Haskenhoff’s counsel regarding the alleged harassment:
Q. So regardless of whether somebody complains, if men are commenting on another female’s breasts in the workplace, that would be a violation of Homeland’s policy? A. Absolutely. If it was brought to my attention and I knew about it or anybody in the company knew about it, we .would address it immediately.
Q. Including the plant manager? A. Including the plant manager.
Q. And obviously if your plant manager is making the comments about a woman’s breast, he knows he’s doing that; yes? It is not sufficient that the perpetrator himself knows what he is doing, even if he is a supervisor. Rather, to be placed on actual notice, someone "with authority to address the problem” must be notified. Sharp, 164 F.3d at 930 (quoting Nash v. Electrospace Sys., Inc., 9 F.3d 401, 404 (5th Cir. 1993); see also Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787, 801 (8th Cir. 2009) ("An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it.”). The inquiry must focus on whether someone with authority to discipline Howes and to take remedial action knew of and failed to address the conduct. Sharp, 164 F.3d at 930 ("In the context of sexual harassment, such persons are those with remedial power over the harasser.”). Alternatively, Hasken-hoff may prove constructive knowledge by showing harassment was so.open and pervasive that, in the exercise of reasonable care, it should have been discovered by management-level employees. See Alvarez v. Des Moines Bolt Supply, Inc., 626 F.3d 410, 422 (8th Cir. 2010).

. This standard does not require retaliation to be the sole cause; the retaliatory motive may combine with other factors to produce the result so long as "the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back.” Burrage v. United States, 571 U.S. -, -, 134 S.Ct. 881, 888, 187 L.Ed.2d 715 (2014).

. The phrase "because of” does not require a motivating-factor standard of causation. As the Supreme Court noted in Nassar, the default rule in interpreting causation in tort is that "[i]n the usual course, this standard requires plaintiff to show ‘that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct.” 570 U.S. at -, 133 S.Ct. at 2525 (quoting Restatement of Torts § 431 cmt. a (1934) (negligence)). Additionally, "the ordinary meaning of 'because of is 'by reason of or ‘on account of.’" Id. at -, 133 S.Ct. at 2527 (quoting Gross v. FBL Fin. Servs., Inc., 557 U.S. 167, 176, 129 S.Ct. 2343, 2350, 174 L.Ed.2d 119 (2009)). Thus, the Nassar Court concluded that when interpreting "because of,” it must mean that the retaliatory intent was " 'the *584 "reason” that the employer decided to act,’ or, in other words, that ’[retaliation] was the "but-for” cause of the employer’s adverse de-cisión.’ ’’ Id. at -, 133 S.Ct. at 2527 (quoting Gross, 557 U.S. at 176, 129 S.Ct. at 2350).

. Iowa had a statute predating Title VII, a criminal provision, which stated,
1. Every person in this state is entitled to the opportunity for employment on equal terms with every other person. It shall be unlawful for any person or employer to discriminate in the employment of individuals because of race, religion, color, national origin or.ancestry. However, as to employment such individuals must be qualified to perform the services or work required.
[[Image here]]
3. Any person, employer, labor union or officer of a labor union or organization convicted of a violation of subsections one (1) or two (2) of this Act shall be punished by a fine not to exceed one hundred dollars or imprisonment in the county jail not to exceed thirty days.
1963 Iowa Acts ch, 330, § 1 (codified at Iowa Code § 735,6 (1966), subsequently transferred to section 729.4 (1979)). This statute makes no mention of retaliation.

. See 1965 Iowa Acts ch. 121, § 8 (codified at Iowa Code § 105A.8 (1966)). The Iowa provision used the language in Title VII of the Civil Rights Act of 1964. Compare id. § 8(2) (prohibiting retaliation "because such person *586 has lawfully opposed any practice forbidden under this Act, obeys the provisions of this Act, or has filed a complaint, testified, or assisted in any proceeding under this Act”), with Civil Rights Act of 1964, Pub. L. No. 88-352, § 704(a), 78 Stat. 241, 258 (codified as amended at 42 U.S.C. § 2000e-3(a) (prohibiting retaliation "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title").

. For example, in Wholf v. Tremco, Inc., the Ohio Court of Appeals applied a higher causation standard to a retaliation claim under its own civil rights statute. 26 N.E.3d 902, 908-09 (Ohio Ct. App. 2015). The Wholf court noted,
[T]he [Ohio] General Assembly separated status-based discrimination claims from retaliation claims in separate subsections of R.C. 4112.02. And, despite Wholf's argument to the contrary, Ohio’s anti-retaliation provision is nearly identical to Title VII’s anti-retaliation provision.
Id. at 908. The court also pointed out that "the ‘but-for’ standard articulated in Nassar is not a new standard; it is a clarification of the standard that has been applied in retaliation cases since the Supreme Court decided Price Waterhouse [v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775 [104 L.Ed.2d 268] (1989),] in 1989." Id. at 912; see also Asbury Univ. v. Powell, 486 S.W.3d 246, 255 (Ky. 2016) (noting that previous cases aligned with Nassar by employing a substantial-factor test, in which the improper reason must be an "essential ingredient” in the discharge (quoting First Prop. Mgmt. Corp. v. Zarebidaki, 867 S.W.2d 185, 187 (Ky. 1994))); Goree v. United Parcel Serv., Inc., 490 S.W.3d 413, 439 (Term. Ct. App. 2015) (stating that Tennessee Act did not require sole causation, but required but-for causation, following Nassar); Navy v. Coll. of the Mainland, 407 S.W.3d 893, 901 (Tex. Ct. App. 2013) (stating that unlike discrimination claims, retaliation claims require higher standard of causation under Texas Act).
Other courts recognize that a higher standard of causation is necessary for retaliation claims, though they define the standard in varying ways. See Hensley v. Botsford Gen. Hosp., No. 323805, 2016 WL 146355, at *6 n.1 (Mich. Ct. App. Jan. 12, 2016) (per curiam) (suggesting that under a significant-factor or but-for test, the result would be the same); Thompson v. Dep’t of Corr., No. 319668, 2015 WL 1261539, at *5 (Mich. Ct. App. March 19, 2015) (per curiam) (“While there is authority that states an employer is liable if discrimination is a motivating factor, retaliation cases continue to require a showing that retaliation must be a significant factor.” (Citation omitted.)); Lacasse v. Owen, 278 Or.App. 24, 373 P.3d 1178, 1183 (2016) (”[P]laintiff must prove that defendant’s unlawful motive was a substantial factor in his termination, or, in other words, that he would have been treated differently in the absence of the unlawful motive.”); Allison v. Hous. Auth., 118 Wash.2d 79, 821 P.2d 34, 94-95 (1991) (en banc) (declining to adopt a standard imposing liability if retaliation affected motive "to any degree”).

. The performance improvement plan stated Haskenhoff must abide by the following: (1) not "walk[ ] off the job and abandon [her] job responsibilities”; (2) not "us[e] vulgar language towards another”; (3) not "send[] hostile, disrespectful, or inappropriate emails to employees”; (4) not "post[] comments about the company or other employees on a social network”; (5) go through the chain of command rather than ''addressing] the problem [her]self”; (6) attend work during the "core work hours of 8AM to 4PM” and "approv[e] ahead of time” coming in or leaving early; (7) not leave the plant "during the work day for non-work related reasons”; and (8) approve paid time off "ahead of time.”

. It has been suggested our decision in Van Meter Industries was not precedential on this point. However, whether Sires could recover without giving the employer a “reasonable opportunity to resolve the problem” was a fighting issue. That was the basis for the district court’s reversal of the commission's decision. See Van Meter Indus., 675 N.W.2d at 510. We recognized the defendant employer “claim[ed] Sires failed to give the company an adequate opportunity to address her grievances and so cannot rely on the constructive discharge doctrine.” Id. at 513. We addressed that claim, spending almost a full page on the discussion. Id.; see also Ackelson, 832 N.W.2d at 688 ("We are slow to depart from stare decisis and only do so under the most cogent circumstances.”).

. It has been suggested giving the employer a reasonable chance to resolve the problem "is another effort to transplant” the Faragher-Ellerth defense. However, this assertion overlooks that the Faragher-Ellerth defense has already been held to apply to certain instances of constructive discharge. See Pa. State Police v. Suders, 542 U.S. 129, 141, 124 S.Ct. 2342, 2351, 159 L.Ed.2d 204 (2004) (stating absent a "tangible employment action,” the defense "is available to the employer whose supervisors are charged with harassment” resulting in constructive discharge)'; see also id. at 150-51 & n.10, 124 S.Ct. at 2356 & n.10 (noting Eighth Circuit and other caselaw analyzing whether "employee’s decision to resign was reasonable under the circumstances” specifically consider whether the employer was given "a chance to respond” (first quoting Suders v. Easton, 325 F.3d 432, 462 (3d Cir. 2003); and then quoting Jaros v. LodgeNet, Entm’t Corp., 294 F.3d 960, 965 (8th Cir. 2002))).
Principles of deterrence and avoidance un-dergird theories of employment liability. See Sara Kagay, Applying the Ellerth Defense to Constructive Discharge: An Affirmative Answer, 85 Iowa L. Rev. 1035, 1061 (2000) (“The purpose of Tifie VII is to encourage anti-harassment policies, promote conciliation, and prevent harassment.”). These principles are evident in both the doctrine of constructive discharge and the Faragher-Ellerth defense. See Shari M. Goldsmith, The Supreme Court’s Suders Problem: Wrong Question, Wrong Facts Determining Whether Constructive Discharge Is a Tangible Employment Action, 6 U. Pa. J. Lab. & Emp. L. 817, 835 (2004) ("By emphasizing the employee’s obligation to seek redress and the employer’s duty to avoid harm, the dominant approach to constructive discharge goes to the heart of the Court’s Ellerth/Faragher motivations and purpose.”).
If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.
Faragher, 524 U.S. at 807, 118 S.Ct. at 2292.

. In Missouri, a previous case held an employee did not have to allow a reasonable opportunity to respond before claiming constructive discharge. See Pollock v. Wetterau Food Distribution Grp., 11 S.W.3d 754, 761, 765-66 (Mo. Ct. App. 1999). That case has been undermined by later cases holding a constructive discharge does not occur "without giving the employer a reasonable chance to resolve the problem.” DeWalt, 398 S.W.3d at 501; see also Gamber v. Mo. Dep’t of Health & Senior Servs., 225 S.W.3d 470, 479 (Mo. Ct. App. 2007). Other states considering whether an employee gave the employer a reasonable opportunity to respond include West Virginia, Nebraska, and Minnesota. Waldron v. Lyman Lumber Co., No. A10-997, 2011 WL 206175, at *3 (Minn. Ct. App. Jan. 25, 2011); Gavin v. Rogers Tech. Servs., Inc., 276 Neb. 437, 755 N.W.2d 47, 56 (2008); Anderson v. First Century Fed. Credit Union, 738 N.W.2d 40, 50-51 (S.D. 2007); Ford Motor Credit Co. v. W. Va. Human Rights Comm’n, 225 W.Va. 766, 696 S.E.2d 282, 296 (2010) (per curiam); see also Charles v. Regents of N.M. State Univ., No. 28825, 2010 WL 4703506, at *1 (N.M. Ct. App. Nov. 4, 2010) (noting that New Mexico *599 courts consider "whether an employer had an opportunity to or attempted to resolve the problem” as a factor when evaluating constructive discharge).

. Iowa Rule of Evidence 5.702 has since been amended and now reads,
A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert’s scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.
Iowa R. Evid. 5.702 (2017).