**IN THE COURT OF APPEALS OF IOWA**

No. 17-0496
Filed May 16, 2018

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**RYAN BARNHARDT,**
    Defendant-Appellant.

_____

    Appeal from the Iowa District Court for Boone County, Steven J. Oeth, Judge.

    Ryan Barnhardt appeals from the judgment and sentence entered following his convictions on ten counts of sexual abuse. **AFFIRMED.**

    Mark C. Smith, State Appellate Defender, and Maria L. Ruhtenberg, Assistant Appellate Defender, for appellant.

    Thomas J. Miller, Attorney General, and Timothy M. Hau, Assistant Attorney General, for appellee.

    Considered by Vogel, P.J., Doyle, J., and Scott, S.J.*

    *Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2018).

**DOYLE, Judge.**

Ryan Barnhardt appeals from the judgment and sentence entered following his convictions on ten counts of sexual abuse, which the State brought against him after five children alleged that Barnhardt had engaged in sex acts with them.

**I. Expert Witness Testimony.**

Barnhardt first contends the district court erred by allowing testimony from the State's expert witness that improperly vouched for the complaining witnesses' credibility. We review the district court's ruling on the admissibility of expert witness testimony for an abuse of discretion. *See State v. Dudley*, 856 N.W.2d 668, 675 (Iowa 2014). An abuse of discretion occurs when the district court "exercises its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable." *Id.* "When a ground or reason is based on an erroneous application of the law or not supported by substantial evidence, it is untenable." *Id.*

A person with specialized knowledge that will help the trier of fact to understand the evidence or to determine a fact in issue may testify as an expert witness. *See* Iowa R. Evid. 5.702. An expert witness may not directly or indirectly comment on the credibility of a witness or bolster a witness's credibility. *See State v. Dudley*, 856 N.W.2d 668, 676-77 (Iowa 2014). Our supreme court has recognized that in cases of child sexual abuse, "there is a very thin line between testimony that assists the jury in reaching its verdict and testimony that conveys to the jury that the child's out-of-court statements and testimony are credible." *Id.* at 677. Barnhardt asserts that line was crossed here.

Tammera Bibbins testified as an expert witness for the State. Bibbins is a forensic interviewer trained to interview children when there are allegations of

abuse. Although Bibbins interviewed all five complaining witnesses, she testified she was not rendering an opinion as to whether the children were being truthful in their interviews or whether Barnhardt was guilty.[1] She testified her job "is simply to interview children and try to provide an environment where they can give the most accurate account" of what occurred. Bibbins testified generally about the misconceptions adults have of children and how children may react to traumatic events:

> Q. Is there also kind of misconceptions sometimes with adults about children's ability to be able to relate times?
> MR. ROUNDS [Public Defender]: Objection. Vouching.
> MS. KRISKO [Assistant Attorney General]: This was specifically okayed in [*State v.*] *Tjernagel*[, No. 15-1519, 2017 WL 108291 (Iowa Ct. App. Jan. 11, 2017)].
> THE COURT: Just talk generally about kids, not about the kids in this case, okay?
> THE WITNESS: Okay.
> THE COURT: That's what you're doing?
> THE WITNESS: Yes.
> THE COURT: Overruled.
> THE WITNESS: Could you repeat the question?
> Q. Sure. Again we're not talking specifics. I mentioned that you did interview but you are now talking about children in general, correct? A. Yes.
> Q. And child sexual abuse dynamics? A. Yes.
> Q. Okay. Is there a misconception amongst a lot of adults that kids are good time keepers?
> MR. ROUNDS: Same objection.
> THE COURT: Same ruling.
> A. Yes, there is a misconception.
> Q. And so would you explain to the jury what that misconception is?
> MR. ROUNDS: Same objection.
> THE COURT: Same ruling.
> A. Research says that children really aren't good at clock time until they're maybe around ten years of age, and kind of think about

---

[1] We note that this statement would not "cleanse" any impermissible testimony that followed. *See State v. Pitsenbarger*, No. 14-0060, 2015 WL 1815989, at *8 (Iowa Ct. App. Apr. 22, 2015).

it in terms of as adults we keep appointments, we have calendars, we have watches. We . . . have calendars that keep us on track.

Children don't have that. They get told where to go, they get told what time things are. So they really don't have to pay attention to time. And their days are pretty similar day to day where adults have probably many different activities they have to attend to.

So experientially they don't have to pay attention to time. Developmentally usually until the age of ten it really is not cognitively there for them.

Q. . . . [Y]ou said clock time. Does that include calendar time?

MR. ROUNDS: Same objection.

A hearing on Barnhardt's objection was held outside the jury's presence, the court stated it would rule on the objections as they were made, and the prosecutor resumed questioning Bibbins.

Q. So we talked a little bit about clock time. You would agree that that also includes calendar time, like dates when things happen? A. Yes.

Q. Do you find that here are some myths or that adults expect a child's response to traumatic events to be beyond their developmental abilities.

MR. ROUNDS: Same objection.

THE COURT: Objection is overruled.

A. Yes.

Q. Can you give us an example?

MR. ROUNDS: Same objection.

THE COURT: Overruled.

A. Okay. Some of the myths about how children will respond, one I kind of gave earlier, that children would not want to be around someone who has abused them. Another myth is that children will tell right away that . . . some kind of abuse has happened.

Q. And that's got a kind of specific term in your field, does it not? A. Yes, it does.

Q. What's it called? A. It's delayed disclosure.

Q. What does that mean? A. Basically, it means that when abuse happens the disclosure of that abuse isn't revealed or told right away. . . . [T]here's a delay in time between when the abuse happens and when the child discloses that the abuse has happened.

Q. And just in general again, what are some of the reasons for that that both your experience and research has found?

MR. ROUNDS: Vouching. Objection.

THE COURT: Overruled.

A. Research and literature says that some of the reasons why children will delay disclosing, one would be fear. Fear of the abuser

and if the abuser's made threats or fear that they won't be believed when they do tell. Fear that they may themselves be responsible for what happened. So there's shame and guilt associated with that.

Some children fear the loss that it will bring. It might break up a family. It will cause disruption in relationship. So fear is a really big reason why disclosure can be delayed.

Q. Does that go back to kind of the cognitive abilities of children that you talked about earlier, that they don't always process things the same way that an adult would?

MR. ROUNDS: Objection. Leading and vouching.

THE COURT: Overruled.

A. I would say yes.

Q. Also with kind of this delayed disclosure information, when information does start to come out, does it always come out in a nice, neat fashion?

MR. ROUNDS: Objection. Vouching.

THE COURT: Overruled.

A. No. The literature and research speaks to disclosure being a process where at the beginning you may have tentative disclosure where kids may kind of test the water. They give a little bit of what happened, just to see the reaction of the adults and to see how they're going to be received.

Are people going to believe them or not? Are parents going, to freak out? Is their family going to break down? And so they kind of go through that process. Once kids feel safe or feel like they'll be supported, then more information will likely come out.

Q. And this is again completely general, not specific to this case. In your experience, as well as in the research, does the way in which disclosure happens—does that sometimes impact what a child will say?

MR. ROUNDS: Objection. Vouching.

THE COURT: Overruled.

A. Can you restate your question?

Q. Sure. I'll try. We talked about partial or tentative disclosure. I've heard the terms accidental disclosure, things like that. What is that?

MR. ROUNDS: Same objection.

THE COURT: Overruled.

A. An accidental disclosure would be more like if something was discovered so that the child did not intentionally want the abuse to be disclosed but somehow it was brought out. If someone witnessed something, then went and reported it.

Q. And so could that affect—say if they were giving information, could that affect their willingness to give information about it—a particular event?

MR. ROUNDS: Objection. Vouching.

THE COURT: Overruled.

A. Yes. That can affect the way that . . . children would give information if they were asked about it. Because if they were not ready and if they were not in active disclosure, if they were still tentative about it, and someone asked them about it, they may not fully give all the information because they were not ready.

Q. Is it your experience that people that aren't in the field— would they assume that a child would do everything they could to stay away from an abuser if abuse was happening? A. Yes.

MR. ROUNDS: Objection. Vouching. Ask my objection precede the answer.

THE COURT: The objection will be considered as having been made before the answer. The objection is overruled.

Barnhardt concedes that Bibbins testified "generally" about children but complains that this testimony specifically tracked each potential weakness in the State's case. For example, none of the children could remember the first time the abuse occurred, only one child could testify concerning his age when the abuse began, and all of the children "were generally very vague about when the abuse occurred." Barnhardt argues that in explaining these inconsistencies in general terms, Bibbins improperly commented on the complaining witnesses' credibility. We disagree. An expert witness may testify in generalities about the behavior of children who have been sexually abused. *See generally State v. Jaquez*, 856 N.W.2d 663, 666 (Iowa 2014) ("We allow an expert witness to testify generally that victims of child abuse display certain demeanors."); *Tjernagel*, 2017 WL 108291, at *6 (finding expert's testimony "that young children who are victims of sexual abuse do not disclose everything about an incident at the first opportunity, that young children are not accurate as to dates and time, or that it would not be unusual for young children to refer to a parent's 'appointment' as a 'meeting'" did not cross the line into impermissible vouching); *State v. Huffman*, No. 14-1143, 2015 WL 5278980, at *6 (Iowa Ct. App. Sept. 10, 2015) (holding expert testimony

did not constitute impermissible vouching where it "provid[ed] the jury information about the ability of a child to remember details" and "provided the jury some perception about [the complaining witnesses'] knowledge of the facts" rather than the truthfulness of their statements). The line is crossed into impermissible vouching when the expert testifies—directly or indirectly—that the behavior of a complaining witness comports with how children who have been sexually abused generally behave. *See Dudley*, 856 N.W.2d at 677 ("To allow an expert witness to testify a child's physical manifestations or symptoms are consistent with sexual abuse trauma . . . allows the expert witness to indirectly vouch that the victim was telling the truth because the expert opines the symptoms are consistent with child abuse."); *Jaquez*, 856 N.W.2d at 665-66 (finding expert witness testimony that the complaining child's demeanor was "completely consistent with a child who has been traumatized, particularly multiple times" impermissibly vouched for the child's credibility); *Tjernagel*, 2017 WL 108291, at *6 (finding testimony that child was able to give "unique" or "out of the ordinary details" crossed the line into impermissible vouching where expert had previously testified that such detail about an event indicated it was less likely a child had been coached); *Pitsenbarger*, 2015 WL 1815989, at *8 (holding expert's testimony that "every significant purported and disputed fact [of the case], including behaviors and out-of-court statements[, were] consistent with the statistics and reports" of sexual abuse impermissibly vouched for the child's testimony and lent credence to it); *State v. Pansegrau*, 524 N.W.2d 207, 211 (Iowa Ct. App. 1994) (holding it was impermissible to ask an expert witness a hypothetical question that outlined the specific events the complaining witness had already to testified to, thereby personalizing the expert's opinion and

conclusion to the complaining witness).  In other words, the expert may assist the jury by providing specialized knowledge about how children react to trauma, but it is for the jury to determine whether the complaining witness's behavior conforms to those generalities.  For the expert to opine that the child's behavior is consistent with the behavior of children who have been sexually abused impermissibly vouches for the child's credibility.  The former occurred here.  Bibbins's testimony provided the jury with general information about the behavior of children who have been sexually abused; the jury could determine for itself whether the complaining witnesses acted in accordance with that behavior and reach its own conclusions about their credibility.  The district court did not abuse its discretion in permitting Bibbins's testimony.

**II. Jury Instruction.**

Barnhardt also contends a jury instruction improperly commented on the evidence.  We review jury instruction for correction of errors at law.  *See Haskenhoff v. Homeland Energy Solutions, L.L.C.*, 897 N.W.2d 553, 570 (Iowa 2017).  "Instructional error 'does not merit reversal unless it results in prejudice.'  Prejudicial error results when instructions materially misstate the law or have misled the jury.  Jury instructions must be considered 'in their entirety' when assessing prejudice.  'We assume prejudice unless the record affirmatively establishes that there was no prejudice.'"  *Id.* (citations omitted).

Barnhardt alleges the trial court erred in instructing the jury that "[t]he law does not require that the testimony of the alleged victim be corroborated."  Barnhardt objected to the instruction, alleging it "unfairly draws attention to this and in effect allows the State to argue to lower the burden."  The court overruled the

objection. On appeal, Barnhardt argues the instruction unfairly commented on the trial testimony and violates Iowa Code section 709.6 (2016), which states, "No instruction shall be given in a trial for sexual abuse cautioning the jury to use a different standard relating to a victim's testimony than that of any other witness to that offense or any other offense."

Prior to the legislature's enactment of section 709.6, *see* 1976 Iowa Acts ch. 1245 § 906, Iowa law stated that a defendant "in a prosecution for rape, or assault with intent to commit rape, . . . cannot be convicted upon the testimony of the person injured, unless she be corroborated by other evidence tending to connect the defendant with the commission of the offense," *State v. Smith*, 195 N.W.2d 673, 674 (Iowa 1972) (quoting Iowa Code § 782.4 (1966). This requirement for corroborating evidence "plays on long-held myths that rape victims—and women more generally—cannot be trusted." Tyler J. Buller, *State v. Smith Perpetuates Rape Myths and Should Be Formally Disavowed*, 102 Iowa L. Rev. Online 185, 195 (2017). However, despite the change in the law,

> the implicit effects of institutionalized sexism and anti-victim bias persist in the hearts and minds of jurors. The research shows that myths about sex-assault victims are pervasive, continually reinforced by rape culture and false stereotypes. One of those rape myths, still held today, is the erroneous belief that a sexual assault victim's testimony is not enough to find a defendant guilty. Potential jurors, misled by rape culture biases and the media, believe they cannot convict when cases do not have corroborating evidence such as DNA or eyewitnesses. Yet the reality is that most sex assaults do not cause visible injuries and eyewitnesses are exceptionally rare.

Tyler J. Buller, *Fighting Rape Culture with Noncorroboration Instructions*, 53 Tulsa L. Rev. 1, 2–3 (2017) (footnotes omitted).

By using section 709.6 to argue against the court's noncorroboration instruction, Barnhardt turns the statute on its head. And his concerns about the instruction lessening the State's burden in obtaining a conviction for sexual assault ring false.

> The historical track record for prosecuting sex crimes suggests obtaining convictions is remarkably difficult and is not likely to become easy any time soon. In important ways, "the charge of rape [is] easier to disprove than other violent felonies: first, the victim is a convenient target for the focus of the trial; second, the jury is often reluctant to weigh the evidence impartially."

*Id.* at 24–25 (footnotes omitted). The challenged instruction accurately states the law. *See State v. Hanes*, 790 N.W.2d 545, 548 (Iowa 2010) (stating our review is to determine whether the instruction accurately states the law and is supported by substantial evidence). When the instructions are read as a whole, it is clear that the State had the burden of proving Barnhardt's guilt beyond a reasonable doubt. *See id.* ("[W]e examine jury instructions for reversible legal error by considering the instructions as a whole, and 'if some part was given improperly, the error is cured if the other instructions properly advise the jury as to the legal principles involved.'" (citation omitted)). We find no error.

**III. Motion to Strike Juror.**

Finally, Barnhardt contends the trial court erred in denying his challenge to a potential juror for cause. Specifically, he argues the court erred in denying his challenge for cause under Iowa Rule of Criminal Procedure 2.18(5)(k), which allows a defendant to challenge for cause a potential juror who has "formed or expressed such an opinion as to the guilt or innocence of the defendant as would prevent the juror from rendering a true verdict upon the evidence submitted on the

trial." Because the district court is vested with broad discretion in making such rulings, we review this claim for an abuse of discretion. *See State v. Jonas*, 904 N.W.2d 566, 570-71 (Iowa 2017).

During voir dire, Barnhardt's counsel asked potential jurors about their ability to compartmentalize the evidence against Barnhardt with regard to the allegations of sexual abuse as to each child. Some of the potential jurors expressed reservations about their ability to do so. After one juror stated it would be difficult for her to do that because she is a mom, another juror spoke:

> [POTENTIAL JUROR]: I could piggyback off what she's saying. [I have a child. I've been involved in various activities with my child within the community]. So I'm around a lot of children. So again it would be hard to shut your mind off and then go to the next scene I guess you would say. . . . I would think about those kids.
> MR. ROUNDS: Okay. So . . . once you saw the video, . . . you're worried that it would bleed into the other eight counts?
> [POTENTIAL JUROR]: Yeah.
> MR. ROUNDS: Okay. Can you follow the judge's instruction?
> [POTENTIAL JUROR]: I could. I could.
> MR. ROUNDS: Your answers seem to contradict each other.
> [POTENTIAL JUROR]: But I mean, I'm just being honest.
> MR. ROUNDS: That's what I want.
> [POTENTIAL JUROR]: But we're here to do a job, and I think you have to . . . prepare yourself for that and not make any judgments.

Barnhardt's attorney moved to strike the juror for cause. The court then attempted to clarify its perception of the exchange, asking the juror at issue, "[D]id you say you could not separate them? I thought you said you could." The juror replied, "I could separate them. I could."

The prosecutor was given a chance to rehabilitate the jurors who expressed reservations. After three jurors stated that they would be unable to independently evaluate Barnhardt's guilt on each charge once they had viewed video evidence

of him sexually abusing one of the children, the prosecutor returned to the juror at issue and asked, "Could you do that?" The juror responded, "Yes, ma'am." Because the challenged juror stated her ability to independently evaluate Barnhardt's guilt on each of the charges, the court properly exercised its discretion in denying Barnhardt's challenge for cause.

**AFFIRMED.**